# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed April 18, 1922.

MARIE VIOLET ALLEN
VS.
COVINGTON K. ALLEN
AND
COVINGTON K. ALLEN
VS.
MARIE VIOLET ALLEN.
(Cross-Bills)

*A. S. J. Owens* for Marie Violet Allen.
*John L. Sanford* for Covington K. Allen.

BOND, J.—

These facts may, I think, be taken either as undisputed or as established by a strong preponderance of evidence. The wife was, up to the time of her breakdown, an ordinarily good and devoted wife and mother. She was a woman of good standing, and since recovering from her breakdown has continued making a good impression. The husband, too, is a man who has always made a good impression. He has long been employed by the city, and is described by one of his chiefs as the best engineer the city has had on construction work. He is now engineer in charge of one of the most important piece of city work. He, too, impressed his neighbors and friends as a good husband and father. And that he was a devoted husband, and continued to be such long after the separation, is abundantly shown by his letters. The wife said to one of her neighbors that she had one of the finest of husbands.

The couple had one child, born in 1907, a boy, still living, and another was still-born in 1910. The birth of further children seems to have been prevented by the wife's wish.

I cannot find anything of importance in the incidents adduced to show improper treatment of the son by the one parent or the other.

This married life ran on with every appearance of contentment and happiness, with one possible exception, from 1905 to 1917. The one exception, testified to by both parties, occurred upon the husband's discovering some letters received by the wife from a Canadian soldier abroad. Those produced in court contain nothing objectionable, outside of the main fact that they were written to the wife by a man who was a stranger to the husband, without the husband's knowledge. The husband testifies to a recollection of other letters not so free from objection. But the disturbance over these letters, whatever it may have amounted to, did not produce anything like a breach. The wife testifies that the husband made, at the time, a disturbance for which he afterwards expressed sorrow, adding "that sometimes in our lives we had all done things we were sorry for."

On July 28, 1917, the wife left home to make a short visit to the husband's parents at Coatesville, Pennsylvania, and to get her son, who was already there, intending to go from Coatesville to Cape May for a visit to her own mother. On the details of her departure from Baltimore we have conflicting testimony to deal with. From Coatesville, and later from Cape May, she wrote almost daily to her husband, her letters being made up of such familiar commonplaces as would be expected between an undisturbed married pair, and

all expressing affection and devotion. She wished he were going with her to Cape May, and said she would write every day. From Cape May she wrote that she wished he were there, and said that she would see him in a week, that she expected to come home Friday, that she was coming home because she knew he was lonely. "Nanna has asked me," she wrote, "to stay another week, but I will not if you are tired." "What shall I bring you from the ocean?" And on August 14th she wrote: "How can I pick up if I have to worry about you being sick?" In a few letters she wrote of trouble again with her nerves, saying that she could not help worrying about things at home. There was much written about the child, requests to have his bathing suit and other such things sent from this or that place about the house. The husband's letters to her during the same period were of the same character and tone, all seemingly commonplace letters from a devoted husband.

On about August 18th, the wife had at Cape May what is termed her breakdown, the incidents of which included rambling, confused talk, an attempt to jump out of an upper window of her hotel, walking in the corridor unclothed, a notion that the Germans were after her, and later considerable talk of unimportant business matters of her husband's in the recent past. The husband was called to Cape May, and on the next day the wife was taken to a sanitarium or "rest house," as it is called, near Philadelphia. On the way up to this place she was attended by a special nurse, and by a maid from the hotel who had an influence over the distraught woman. She remained in the place of confinement near Philadelphia until late in the following December, when she was discharged, and came to her mother's apartment in Baltimore.

Some time during the latter part of her confinement the wife talked of obtaining a divorce from her husband. Just when this suggestion of divorce started is not clear. She spoke to the husband about it when he was permitted to visit her early in December, but discussion or argument was avoided by the husband, under instructions of the physician. The wife never returned to her husband after coming from the rest house; although the couple met at infrequent intervals, and the desire of each one for the custody and companionship of the child brought up increasingly difficult problems, the wife never took up her life with the husband again. He urged her several times to do so, expressed the same devotion and anxiety for her return, and promised to do everything possible to suit her, but the wife never yielded. And after the lapse of three years she entered this suit for a divorce a vinculo matrimonii on the ground of alleged abandonment by the husband, consisting of a separation forced by cruel and vicious treatment on his part. The husband filed the cross-bill for divorce on the ground of abandonment by the wife.

The wife, in support of her bill, gives testimony that during the last eight years of the married life the husband had, almost nightly, by the exercise of physical force, compelled her to join him in mutual perverted practices; that these practices were against her will, abhorrent and repulsive to her, and caused her increasing pains and loss of health; that on the night before she left for Coatesville, on July 28, 1917, her husband's treatment of this description reached an unbearable extreme, and upon this she decided that she could not endure living with him any longer. When she left home for Coatesville, she says, she told her husband and told his mother, that she was leaving him permanently. She further testifies that she told her mother at Cape May, of the treatment she had received, and both she and her physician at the rest house near Philadelphia testify that she told him the same things on her arrival there. There is further testimony by the wife, by her sister, and by her brother-in-law; that the husband admitted to the wife's mother that he had been treating his wife in the manner complained of. And the Philadelphia physician says a like admission was made to him. Psychiatrists have testified that the wife's mental or nervous breakdown was such as could have been produced by the perverted practices described, if forced upon her, against her will. The "mental conflict" which would be involved in that situation, they say, could have brought about such a breakdown. One psychiatrist, Dr. Brush, is not of that opinion. In letters of the husband written after the wife's breakdown there are some ex-

pressions of sorrow for what he had done and for what he had left undone, and of hope for forgiveness; and these expressions are cited as corroboration of the wife's allegations of the improper practices.

The husband denies that any such practices occurred, and denies the alleged confessions by him. The expressions of sorrow for things done or left undone, and of hope for forgiveness, he refers to the disturbance or protest made by him to the letters received by the wife from the Canadian soldier.

On this state of facts, the case, then, is one in which a wife seeks an absolute divorce on the ground of a separation consequent upon cruel and vicious treatment of her by her husband which rendered further cohabitation impossible, or, at least, highly injurious to her. That is a ground specifically designated by the law as one for partial divorce, or divorce a mensa et thoro only. Code, Art. 16, Sec. 38. Can the wife, merely by waiting three years after a separation thus forced, obtain an absolute divorce on the ground of abandonment by the husband under Article 16, Section 37?

In the case of Lynch vs. Lynch, 33 Md. 330, the Court of Appeals (Judge Alvey) has said that "cruelty of treatment, which is only ground for a qualified divorce, must not be allowed, when used as a justification for living separate from the offending party, to be made the ground for a final divorce." And that principle has never been overruled since, so far as I can find. It is necessary for us to bear in mind that the doctrine of constructive abandonment, as it is usually called, abandonment by the husband through forcing the wife away from him, has its limited, appropriate place in the law; and that it cannot be made use of to add new grounds for divorce, or to transfer specified grounds from among those designated by the statute for partial divorce to those for which a final divorce may be had. As I see it, that doctrine has no place in this case. If it is proved that the husband by cruel and vicious treatment made it necessary for the wife to live apart, that is a situation of affairs for which the statutes have specifically provided, and we have no reason and no right to add to the specified legal consequences with a fiction of abandonment by the husband,

especially here in view of the husband's desire and earnest efforts to have the wife continue the married life. When we recall that the abandonment which the statute designates as ground for absolute divorce is an abandonment by the party complained against, which has been continued by that party uninterruptedly for at least three years, and is on his part deliberate and final, it seems clear that in this case we are not talking of the same thing. Art. 16, Sec. 37; Twigg vs. Twigg, 107 Md. 676.

Some authorities outside the State suggest an argument that after leaving to escape cruelty a wife may properly consider herself abandoned until the husband offers to resume married relations free from the previous source of trouble, and that if the husband does not at any time within three years hold the way open to such a resumption there is a continued abandonment by him which brings the case within the statute for final divorce on that ground. 1 Bishop, Marriage, Divorce and Separation, Secs. 80, 85; McVickar vs. McVickar, 46 N. J. Eq. 490; and see Taylor vs. Taylor, 112 Md. 666, 674. It is questionable whether this can be reconciled with the statement of principle by Judge Alvey in Lynch vs. Lynch, 33 Md. 330, or, indeed, with the manifest purposes of Sections 37 and 38 of Article 16 of the Maryland Code. It would not in any event dispose of the problem here, where the husband's every intention and effort were the opposite of the abandonment defined in the Code.

It was suggested in argument that after persistent continuation of the cruelty and vicious treatment described by the wife, during eight years of married life, there would be no reasonable hope of a discontinuance upon the resumption of married relations, or no ground for reliance upon a promise of discontinuance. But even if that is true, the argument would be, after all, that in such a situation the cruelty and vicious conduct, if proved, would amount to abandonment by the husband throughout such time as the wife might choose to wait, no matter what the attitude of the husband might be during that time. It would be that cruelty and vicious conduct, standing alone, might serve as ground of absolute divorce. And that is not the law. In point of fact, the wife here says, in reference to the husband's efforts to

have her return, merely that she did not think them serious.

However the disputes on facts may be settled in this case, the wife could, I think, be entitled to no more than a divorce a mensa et thoro.

There is another question of law raised upon the facts as stated, a question of the legal sufficiency of all the testimony favorable to the wife to support her prayer for relief. It is pointed out by counsel that to support the charge of cruel and vicious practices upon which she bases the separation, and upon which she prays a final divorce, there is only testimony by the wife and testimony of admissions by the husband, both without additional, corroborating testimony. Article 35, Section 4, of the Code, provides that no decree of divorce may be entered upon the testimony of a plaintiff alone, and that corroboration of that testimony shall be necessary. Article 16, Section 41, provides that admissions of the defendant of facts charged shall not be taken as conclusive proof of those facts. And in the case of Fisher vs. Fisher, 95 Md. 314, 318, the Court of Appeals has said that, under a long-settled principle, "a cause for divorce cannot be established by admission of parties alone, as public policy requires that such confession to support a decree must be corroborated by other evidence." As this principle is a safeguard against imposition on the court by collusion of the parties, it may be carried out to an absurdity in a case, such as this one, in which the ground for divorce is contested to the utmost. In Heinmuller vs. Heinmuller, 133 Md. 491, 494, the Court of Appeals has also said that the provision of Article 35, Section 4, "is to prevent collusion, and when the whole case precludes, as it does here, any possibility of collusion, the corroboration need be slight."

If corroboration of both the testimony of the wife and the alleged admissions by the husband is necessary, then nothing more than slight corroboration can be found in this evidence. Counsel for the wife urge that it is to be found in the testimony of the psychiatrists that a breakdown such as the wife suffered could have resulted from treatment such as she testifies to. I think that possibility is of doubtful value as corroboration. But the case, as I see it, is one which need not be decided on the point of corroboration, and I think it should not be; so that point is passed undecided.

Taking up the testimony for a decision on the facts, we have a flat conflict; and there are contradictions and inconsistencies on the part of witnesses, some excess of zeal in their support of the side for which they were called. On the main question of the occurrence of the forced practices testified to, the husband himself is the only witness on his side, and his testimony is a flat denial of the occurrence of any such acts, forced or otherwise. In support of his denial, his counsel questions the possibility of a woman's being physically forced, as the wife says she was, to engage in such practices against her will, especially over a long period of time. This testimony of physically forced co-operation, almost nightly, during eight years, is, on its face, weak. I think, however, the wife need not establish the truth of all she says in this respect. It is conceivable that in the married relation there might be a coercion short of a physical overcoming of opposition, which if directed to an improper and abhorrent practice, might constitute cruelty under the law. The wife does not, however, testify to coercion of that description.

The wife's mother, to whom the admissions of the husband are said to have been made, first, and later in the presence of other witnesses, did not herself testify. Dr. Weissenberg, the Philadelphia physician, gives testimony for the wife on that point. He did, as counsel point out, try to aid in having the married life continue, notwithstanding anything that may have been said to him. And his declaration that the wife was perfectly sane and mentally capable at all times from the beginning of her breakdown, is disquieting. The testimony of admissions made by the husband to his mother-in-law in the presence of the other witnesses has some weaknesses. It would show a surprising willingness to condemn himself before those to whom he did not need to mention such a subject. And these others to whom he is said to have mentioned it continued their ordinary intimacy with him apparently unconscious of any reason for doing otherwise. It is further pointed out that during their married life nobody ever heard any complaint from the wife on

the subject, that in the sight of everybody else their life was, on the contrary, a very happy one. That is conceivably consistent with indulgence in the objectionable practices, though not, perhaps, for eight years, and not with much opposition. A remarkable and important element in this case is the fact that contemporary evidence and incidents now recalled show unmistakably that after the time when the disclosures are now testified to have been made, and the wife had, as she now says, withdrawn from her husband finally, it all made no difference in anybody's life. The relations of all, including that of the husband and wife, went on in their ordinary way, exactly as would be expected among people who had never dreamed of the existence of any cause of disturbance. This brings us to the letters and cards which passed between the wife and her husband while she was away at Coatesville and Cape May, up to the time of her breakdown. My opinion is that the state of contentment and devotion of the parties displayed in these letters is irreconcilable with the existence of the ground for divorce which the wife now urges. They reveal the actual situation at the time so much more reliably than is possible with subsequent testimony of witnesses, that, it seems to me, they turn the scale decisively. These letters, after the alleged cruel treatment, exhibit an unruffled married life, and a complete absence of any thought of a separation. Whatever had occurred in the married life of this pair left the wife with no discontent or loss of devotion to her husband, and we must infer that no cause for discontent or loss of devotion had occurred, * * * or, at least, we can not, in the face of the letters, positively find such cause as a fact. Either the practices described did not occur, or if they did occur, they were carried out consistently with the continuance of contented married life, and there was no such force or conflict as to amount to cruel and vicious treatment of the wife. The conclusion is, therefore, that the wife has not sustained her charge, and that her prayer for a divorce must be denied.

"The party charging the matrimonial offense must present more than equally balanced testimony. He must affirmatively and satisfactorily prove it; he must overcome the presumption of innocence, and otherwise make out his case clearly, in proportion to the gravity of the accusation and its heavy consequences." 2 Bishop, Marriage and Divorce, Section 762; Pattison vs. Pattison, 132 Md. 362, 366.

And that conclusion decides the case on the cross-bill, too. The husband charges that without sufficient cause the wife abandoned him, refusing to return to his and her home, more than three years before the filing of the cross-bill; that this abandonment has been continued uninterruptedly by her, is deliberate and final on her part, and without reasonable expectation of reconciliation. All these elements of the husband's case are, as I see it, sustained by the evidence. It was the wife who left, and she persisted in the separation. All testimony on the affairs of the pair has been studied, and I do not find in it evidence to show reasonable legal cause for the wife's leaving. The consequence is that the husband will have to be given a decree.

The remaining question of the custody of the child presents an almost insoluble problem. It is impossible to award its custody consistently with indulgence of the interests of the child itself, and the desires of the two warring parents. I feel that I can not hold either party unworthy to have custody of the child, temporarily at least. It would seem that custody by the mother would under present circumstances amount to actual custody by her relatives (and particularly her sister in British Columbia just at present) along with the mother herself. She lives with her relatives and seems to be dependent upon them. There has been some disparagement of these relatives in the testimony, but I am inclined not to regard it as of importance now. On my general conclusion the father is entitled to primary legal custody of the child, and it will be awarded to him; but it should be awarded with an arrangement to give the wife some of the time and companionship of the son if that can be done consistently with the son's welfare and the father's primary right to custody under the decree. Divided, alternate custody will not be tried again; the decree will provide that the son shall make his home regularly with the father. But, if visits of short duration to the mother can

consistently be made, an arrangement to that end will be decreed. It would be better if this could be worked out in its practical details by an agreement of the parties, and I shall not decree a more definite arrangement until I hear from counsel that an agreement has been entered into, or that it is not feasible.