# THOMAS F. PATTISON

## *vs.*

# CLARA V. PATTISON.

*Divorce: vile names and blows by husband; wife ordered to
leave house; adultery; proof..*

Where a man calls his wife vile names, strikes her, and
orders her to leave the house, it is an expulsion as much as if
he used physical force to eject her; it constitutes such an aban-
donment on his part as to justify rendering her a decree of
divorce *a mensa et thoro.*                           p. 368

On a bill for divorce on account of adultery, there must be
proof of circumstances such as would convince the guarded dis-
cretion of a reasonable and just man.                   p. 367

The burden of proof is upon a complainant, and the evi-
dence must establish affirmatively that actual adultery was com-
mitted, since nothing less than the carnal act itself can lay the
foundation for such a divorce.                          p. 367

*Decided February 27th, 1918.*

Appeal from the Circuit Court for Howard County.
(FORSYTHE, JR., J.)

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*S. S. Field* and *Louis T. Clark,* for the appellant.

*James Clark* and *Harry B. Wolf,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellant filed a bill of complaint in the Circuit Court for Howard County against the appellee for a divorce on the ground of adultery. The appellee answered the bill denying the offense charged, and on the same day filed a cross-bill against the appellant for a divorce *a mensa et thoro* on the ground of abandonment and desertion, for the custody of their infant children and for alimony, and this appeal is from a decree dismissing the appellant's bill and granting the relief prayed in the bill of the appellee.

The evidence in the case covers over three hundred pages of the record, and after a careful consideration of all of the testimony, we find no reason for disturbing the decree of the learned Judge before whom the case was tried, who observed the manner and conduct of the witnesses on the witness stand and had the opportunity, which that circumstance always affords, of passing upon the credibility of their testimony. We will not encumber this opinion with a detailed discussion of the evidence, but will confine ourselves to a reference to some of the important features of it and a statement of our conclusions.

At the time of the offense charged in the bill of complaint the plaintiff was 47 years of age and his wife was 40. They had been married nineteen years and had four children living. Their oldest child, Louis Elwood Pattison, was eighteen years of age and was married and lived in Baltimore City, and the other children—Hilda Virginia Pattison, 10 years of age; Artemus Zepp Pattison, 4 years of age, and Mary Clara Pattison, a baby, 7 months old, lived with their parents, who have resided practically ever since their marriage on the plaintiff's farm in Howard County. The evidence conclusively shows that at or about the time of their birth, and frequently thereafter, the plaintiff asserted that he was not the father of Artemus and Mary Clara. These charges were not only made to his wife, the appellee, but were made to others in her presence and out of her presence, and involved

gentlemen of prominence, other than the party accused in this case, who held the confidence and respect of the people in the neighborhood in which they and the plaintiff resided. The record is entirely devoid of any evidence to support those and other accusations of misconduct made by the plaintiff anterior to the one upon which he based his present suit, and on the record before us they can only be attributed to an unjustifiable attitude of suspicion towards his wife.

The particular offense which is made the foundation of the present suit is alleged to have been committed on the 31st of January, 1917, with a physician, who was a married man 62 years of age, and was enjoying an extensive practice in the neighborhood in which he and the plaintiff reside; who was the friend and medical adviser of the appellee's mother during her life and of her family; who attended the appellee at the time of the birth of each of her children, and who has been the family physician of the plaintiff ever since his marriage. Mary Clara, the baby, had been a frail and delicate child from her birth and required a great deal of medical care and attention, which obliged the defendant to frequently call up the family physician by telephone to come to see the baby or to send her medicine for it. The telephone in the plaintiff's house was on what is called a party line, with which there were a number of connections, and very frequently the defendant could not get a response to her call. When that was the case she would write a note to the Doctor asking him to send medicine or to come to see the baby, and would send the note to his house by a colored man in the employ of the plaintiff. The frequent visits of the Doctor, telephone calls and notes to him, and certain information which he says he got from the colored man and a colored girl about 16 years old who cooked for his family, aroused the suspicions of the plaintiff, and he determined to set a trap for his wife and the Doctor, and apparently employed the colored man and the colored girl to aid him in his plan. Accordingly, on Tuesday, the 30th of January, 1917, he told

his wife that he was going to Baltimore early the next morning. He got up about 5 o'clock the next morning, but instead of going to Baltimore he went into the cellar of his house and remained there until the Doctor arrived, in response to a note from the defendant asking him to come to see the baby. He testifies that after his wife came downstairs that morning she wrote a note to the Doctor and gave it to the colored man to deliver; that the colored man brought the note to him in the cellar and that he took a copy of it, and then handed it back to the man, who took it to the Doctor; that the Doctor arrived about 11 o'clock; that the Doctor and his wife went into the sitting room on the first floor, and that he then came up from the cellar and peeped through the door and saw them in the act of adultery on a davenport. When asked if he, plaintiff, had any weapon in his hand at the time, he said: "Yes, sir; I had the butt end of a whip and it had iron in it." He further testified that when he saw them he did not say anything to the Doctor or his wife, but went into the parlor and walked up and down the parlor until the Doctor went away; that he then went to Ellicott City to consult his lawyer; that he saw his wife the next morning when she came downstairs; that she told him that the baby had had a spasm and had gotten black in the face; that she had not been able to get the Doctor over the telephone and had sent the colored man after him; that he asked her how many times the Doctor had been there, and she said only once; that he did not say anything to his wife that day, but on Friday morning when his wife came downstairs and started to put her arms around him, he told her not to put her hands on him, and then told her what he had seen on the Wednesday before; that she denied it, and when he replied that it was a damn lie, she said: "You are another one," and that he "slapped her side the head." The plaintiff is the only eyewitness to the alleged act of adultery, and his testimony was flatly and positively contradicted by the defendant and the Doctor, who fully explained in their testimony

every visit to the plaintiff's house. The testimony of the colored man and colored girl offered in corroboration of the testimony of the plaintiff is, to say the least, far from satisfactory. Unless the facts to which their testimony relates are satisfactorily explained by the fact that the Doctor was the family physician of the plaintiff and defendant, we would have to assume that the defendant not only confided in them but made them the means of accomplishing her adulterous course. They admitted, on cross-examination, they had never seen anything improper in the relations of the defendant and the Doctor, and the fact that they are now in the employ of the plaintiff may account for their inability to remember many of the things and circumstances in regard to which they were interrogated on cross-examination. The testimony of Louis Elwood Pattison and his wife relates to what occurred on election day in November, 1916. They testified that on that day they were visiting the plaintiff's home, and that when they came back from an entertainment in the evening they saw the Doctor's buggy near the house, and when they went into the house they heard voices upstairs; that in a few minutes his mother came down the back steps, and that "her face was red as a beet and her lips were trembling," and Elwood testified that he never said anything and told his wife not to say anything. The incriminating feature of this evidence is also positively denied by the defendant and the Doctor, and his visit on that occasion explained. On cross-examination, however, Elwood admitted that when on a later visit to his parents' home he needed the care and attention of a physician, and went to see the Doctor and was attended by him, and it is difficult to believe that he could have treated with so much indifference such an offense upon the part of his mother. It is said in *Bishop* on his work on *Marriage and Divorce,* Vol. 2, Section 762: "The party charging the matrimonial offense must present more than equally balanced testimony. He must affirmatively and satisfactorily prove it; he must overcome the presumption of

innocence, and otherwise make out his case clearly, in pro-
portion to the gravity of the accusation and its heavy conse-
quences." In *Kremelberg* v. *Kremelberg,* 52 Md. 553, the
Court said: "The only general rule to be laid down on the
subject, says LORD STOWELL, 'is that the circumstances must
be such as would lead the guarded discretion of a reasonable
and just man to the conclusion; for it is not to lead, a harsh
and intemperate judgment, moving upon appearances that
are equally capable of two interpretations; neither is it to be
a matter of artificial reasoning, judging upon such things
differently from what would strike the careful and cautious
consideration of a discreet man. The rational and legal infer-
ences from such facts must be the same.'" And in the case
of *Thiess* v. *Thiess,* 124 Md. 292, this Court said: "The
burden of proof is upon the complainant, and the evidence
must establish affirmatively that actual adultery was com-
mitted, since nothing less than the carnal act itself can lay
the foundation of a divorce for adultery. * * * It has been
repeatedly decided in this State that in cases of this kind
courts will not grant a divorce *a vinculo matrimonii* except
upon clear, unequivocal and convincing proof, and upon a
state of facts that satisfactorily established the guilt of the
defendant." In the case of *Hawkins* v. *Hawkins,* 65 Md.
104, CHIEF JUDGE ALVEY, speaking for the Court, said:
"The testimony is voluminous, and much of it is conflicting
in its details. It comes largely from the domestic servants
who were employed about the house of the parties during the
time of their cohabitation. Some of these witnesses manifest
a decided bias for the party producing them, while others
testify with more apparent fairness, and without showing
any decided feeling for the one side or the other. And while
the testimony of such witnesses can not be repudiated alto-
gether, it must be considered with caution, and taken always
with due allowance, according to the bias displayed for the
party in whose behalf the witness testifies." Judging the
evidence in this case by the standard fixed by the authorities

we have referred to, and exercising the care and caution
which the gravity of the charge requires, we have not been
able to find in the record sufficient proof to warrant a con-
clusion that the defendant was guilty of the offense alleged.

This brings us to a consideration of the case under the
cross-bill. As we have said, the plaintiff repeatedly accused
his wife of infidelity and denied the paternity of at least two
of her children. These accusations were made to her and to
others, and on one occasion when she was in a delicate con-
dition and most susceptible to their humiliating and distress-
ing effect. This abuse extended through a period of a num-
ber of years, without, so far as the record discloses, any justi-
fication for such conduct, and finally culminated in the
charge of adultery contained in his bill of complaint, which
he has failed to sustain. When he accused her of having had
intercourse with their family physicain and she denied it, he
called her insulting names and struck her, according to her
testimony, with such force that it made her sick for two
days, and told her that she would have to leave his house,
"and the quicker the better." She remained there and in
her room for two days until she could wash some clothes the
colored girl had refused to wash for her baby, and then went
to her sister's and from there to her father's home.

Section 38 of Article 16 of the Code provides that a divorce
*a mensa et thoro* may be granted for abandonment and deser-
tion. Where a wife is forced to leave her husband under such
circumstances, with the evident purpose to put an end to the
marriage relation, he must be held to have abandoned and
deserted her. This case is so strikingly like the case of
*Harding* v. *Harding*, 22 Md. 337, it is not necessary to cite
other authorities. After holding that the evidence was not
sufficient to justify a divorce on the ground of cruelty of
treatment, the Court in that case, speaking through Judge
Bartol, said: "But the evidence establishes the fact that the
appellant was compelled to leave the house of the appellee
and seek a home with her parents. It is true that she was not

ejected from his dwelling by personal violence; but after the birth of her child, and while she was unable to leave her bed, he told her more than once that he would not permit her to remain; 'that she must leave his home as soon as her confinement was over'; and in his answer he admits that he would have removed her from his house if she had not gone. The testimony further shows that after she had left he stated repeatedly that she should not return, and that he would not support her and her child. This conduct on the part of the appellee was accompanied with allegations of the gravest and most serious character, impeaching the virtue and chastity of the appellant, and charging that her child was not his, but the offspring of another man.

"Whatever may have been the causes which led the appellee to adopt this unhappy suspicion, we are compelled to say that there is no evidence in the cause upon which it can rest. Every attempt made to impeach the character of the appellant has signally failed, and testimony clearly shows that before her marriage her character and chastity was free from suspicion or reproach, and her conduct seems to have been blameless, except only in the fact stated by the appellee himself to two of the witnesses, that she had yielded to his embrace two weeks before their marriage.

"This fact may have had some influence upon the mind of the appellee, in giving rise to the suspicion upon which he afterwards acted; but in the absence of any proof impeaching her chastity toward other men, it can afford no justification to the appellee for his subsequent conduct. * * *

"The conclusion we have come to from an examination of the testimony is, that the charge made by the appellee in his answer, of misconduct by the wife before marriage, is not supported by the proof. The character of this charge and the evident sincerity of the appellee in making it, sufficiently demonstrate that the unhappy differences between them was, as he asserted to the witness Stabler, wholly irreconcilable. Under these circumstances, he told her to leave his house;

her expulsion was as much compulsory as if he had employed force to eject her. And being, according to the proof in the record, without sufficient cause, we must consider it as an unjustifiable abandonment and desertion on his part. So it was decided in *Levering* v. *Levering,* 16 Md. 213."

Forcing her to leave his home under the circumstances stated, and then placing upon record a formal charge of adultery against her, shows that the abandonment of the appellant in this case was "the deliberate act" of the husband, "done with intent that the marriage relation should no longer exist" (*Hubbard* v. *Hubbard,* 127 Md. 617), and entitles the appellee to the relief sought in her cross-bill.

The decree of the Court below, from which this appeal was taken, fixed the amount of the allowance to the appellee at $900.00 per year. Subsequently, on the petition of the appellant, plaintiff below, the Court, after a further hearing, reduced the annual allowance to the appellee to $780.00, and from that order no appeal has been taken. The record, therefore, presents no objection to the amount of alimony allowed by the lower Court, and for the reasons stated the decree will be affirmed.

*Decree affirmed, with costs.*