# ANNA MAY FASSETT

*vs.*

# LAWRENCE WARREN FASSETT.

*Divorce—Adultery.*

On a bill for divorce on the ground of the husband's adultery, the evidence of his constant association with another woman, his meetings with her in unfrequented places, his installing of her as housekeeper for himself and his children, and a confession by him of infidelity to his wife, *held* to justify a decree for plaintiff.

*Decided March 15th, 1923.*

Appeal from the Circuit Court for Prince George's County, In Equity (BEALL, J.).

Bill by Anna May Fassett against Lawrence Warren Fassett for divorce. From a decree dismissing the bill, plaintiff appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John A. Garrett,* for the appellant.

*J. Wilson Ryon,* with whom was *A. R. Hassall* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married by a Roman Catholic priest at Erie, Pennsylvania, in 1904. After their marriage they lived for a short time at Toledo, Ohio, where the appellee, who appears to be a builder, was temporarily em-

ployed. In the latter part of the same year they returned to
Erie, where they remained until October, 1918, when they
removed to Brentwood, Prince George's County, Maryland.
They lived together there until May, 1921, when Mrs. Fas-
sett, after a quarrel, left her husband's home and went to
live in the City of Washington. There were three children
of the marriage, all of whom are living, boys, aged 16, 14,
and 12 years. When their parents separated the eldest of
these children went with his mother, while the two younger
ones remained with their father at his home in Brentwood.

On November 15th, 1921, the appellant filed in the Cir-
cuit Court for Prince George's County the bill of complaint
in this case, in which she charged that the appellee had been
guilty of adultery with a certain Roberta Husband, and she
also charged that he had failed to properly provide for his
family, and alleged that he was receiving a salary of fifty
dollars per week and had certain real estate worth $5,000.

In that bill she asked that she be divorced *a vinculo matri-
monii* from her husband; that she be awarded alimony per-
manently and pending the litigation, and that she be given
the care and custody of the three children.

The defendant in his answer, after denying all charges of
misconduct, alleged that his wife was not herself without
fault, but that she had on repeated occasions during their
married life deserted him and their children. Testimony
was taken in connection with the issues made by those plead-
ings, and, on July 27th, 1922, a decree was passed dismiss-
ing the bill. From that decree this appeal was taken.

For reasons which we will state we cannot agree with the
conclusion reached by the learned judge who tried the case
in the lower court, and in our opinion, upon the evidence
before us, there was error in that decree.

The record contains the testimony of curious neighbors,
prejudiced friends, and frightened children, so often found
in such cases, much of it palpably false, some of it incredible,
and a great part of it wholly irrelevant. But, measured by

the standards of ordinary men in dealing with the acts and conduct of their fellows, it does, we think, taken as a whole, fairly establish the allegations of the bill which charge the defendant with adultery.

It could serve no useful public purpose to refer in detail to that testimony, and we will, therefore, only speak of so much of it as is necessary to support and explain the conclusion we have reached.

And first we will briefly state those facts which are not controverted. Shortly after Mr. and Mrs. Fassett came to Brentwood, he bought a house and lot for $2,800, of which $200 was paid in cash, the balance remaining in the property secured by a mortgage. At that time Fassett was employed by the Henderson Manufacturing Company at a salary of $45 per week. His wife was also employed in the City of Washington at a salary ranging from $18 to $22 per week. From the income thus obtained the family was in some fashion fed and clothed, and Fassett paid off $1,100 on the mortgage. It is charged in the bill that Fassett failed to supply necessary fuel and clothing for his wife and family, but the testimony as to that is conflicting and unsatisfactory, although it is clear that, from the earnings of the husband or the wife, the home was kept up in reasonable comfort and the children properly clothed until the separation. The domestic life of Mr. and Mrs. Fassett was not always happy; they quarreled not infrequently, and on several occasions she left his home, but their differences do not appear to have been irreconciliable until the defendant met Mrs. Roberta Husband in October, 1920.

Mrs. Husband is the daughter of a Mrs. Lillian F. Weiner, who lived at Glen Echo, a village on the Conduit Road, in Montgomery County, Maryland, and she herself was at times employed at Glen Echo Park, an amusement resort, located in that village. From that time on Fassett met Mrs. Husband from time to time, and his attentions to her became so marked that on April 1st, 1921, they were the subject of

an anonymous letter sent to her husband, Cissell J. Husband. Her husband, inspired by that anonymous letter, made certain investigations, and as a result appears to have made statements to his wife, apparently in connection with that letter, which she resented, and she thereupon separated from him. So that after the first of May, 1921, Mrs. Husband was separated from her husband, and Mr. Fassett was separated from his wife.

Some time during the summer of 1921 Mrs. Husband appears to have visited Fassett's home, but whether only occasionally or for a considerable period is not clear, but on the third of July of that year Fassett took his two youngest boys to Colonial Beach, where Mrs. Weiner, Mrs. Husband's mother, occupied a cottage, and they stayed with her until she returned to her home in Washington, when they were sent to a home for children, also at Colonial Beach.

While the children were at that resort, Fassett, then separated from his wife, frequently drove down there from Washington with Mrs. Husband, then separated from her husband, but on these trips it is said they were always accompanied by some member of her family. Whilst at that place he took part with Mrs. Husband in the amusements, such as dancing and bathing, usual at such a resort.

After their return from Colonial Beach, he from time to time met Mrs. Husband, took her in his automobile, took her to dances, and some time in November of 1921, took her to reside permanently at his home in Brentwood as his housekeeper. Mr. Fassett's testimony as to the circumstances under which Mrs. Husband came to live at his home as his housekeeper is worth at least passing notice. He said that, because he had had trouble in getting a satisfactory housekeeper, he asked Mrs. Weiner if she could recommend anyone for the position and, to quote his testimony: "She said, 'I will tell you what I will do, I will do my work at home and I will come from Glen Echo to Cottage City and do your work. I will clean your house and make your beds

and I will get your dinner ready so that all you have to do is to put it on the stove.' She said, 'I will do that for you, and then I will come on back home and be there when the girls get home from work.' I thanked her for it. I thought it was very considerate, but it is too much. It is about twenty miles, I would figure, one way, from Glen Echo to Cottage City, and to make that round trip every day, I wouldn't think of it. She didn't, of course, insist on it. I thought it was nice in her offering it, but I couldn't accept it." He then said that Mrs. Weiner suggested that Mrs. Husband act as his housekeeper, and, while he did not immediately accept that suggestion, he did finally install her in that position.

When she came to live at his home he appears to have introduced her, at least to his children, as "Miss Williams." When asked why he did that, he said he did not know, but he "guessed" he did it because it was an "easier name to use." But the relations between the two soon became so pleasantly familiar that he dispensed even with the "easier name" and called her "Roberta," and she in turn reciprocated his kindness by addressing him as "Lawrence." He admitted that she did at times thus address him, but explained it by saying that she did so only when his father was present and she did it then to "designate the difference."

The manner in which Mrs. Husband discharged her duties as his housekeeper inspired in him at least a sincere admiration, for when he was asked whether he loved her he said: "Well, she has been very nice and very good to me and my boys. She came out there and did a mother's work, took a mother's interest in those children, and I admire her. She has certainly been very fine to me in that respect. Q. Do you love her at all? A. Well, I wouldn't say that. It is a different feeling entirely. I admire her, and have a high regard for her, but I don't know that you would call it loving her. I don't think you can love very many people at one time. I just admire her and have a very high regard

for her." These kindly sentiments which Mr. Fassett cherished for his housekeeper she returned in at least equal measure, for when she in turn was asked whether she loved him she said: "Well, he is nice enough to love." And when further questioned she gave this testimony: "Q. Would you like to marry Mr. Fassett? A. I don't think I would ever have the opportunity. Q. If you ever had the opportunity, would you? A. Well, I would think that he would be an ideal husband."

The relations between Mr. and Mrs. Husband and between Mr. and Mrs. Fassett were in sharp contrast to the relations of Mr. Fassett and Mrs. Husband. For when Mrs. Husband was asked: "Do you love Cissell, your husband?" she replied, "I do not." And when Fassett was asked about the relations between him and his wife before their separation, he said: "We were not getting along very sweetly at that time. Q. What was the trouble, mainly? A. Oh, she would get in the moods she would always get in just before she would leave home. It wasn't very pleasant for me, so I wouldn't stay around there any more than necessary." And again in the following testimony he throws light on their relations: "Do you remember saying anything to your wife about you wanted her to get out and get a divorce, and told her to state her price? A. Well, those arguments would come up. She said, 'I will leave you this time and I never will come back,' and all that kind of stuff, and that kind of got on my nerves, and possibly at various times I said, 'All right, go ahead.' * * * Q. Did you ever tell her to go ahead and get a divorce? A. Well, I probably told her to do as she saw fit. I don't know as I ever told her to get a divorce. I don't believe in divorces. Q. You never asked her for her price? A. I don't know as I would have any occasion to do that. Q. Did you ever tell her you wanted to marry somebody else? A. Not that I recall. If I did state it, it would have been for an argumentative purpose."

Another incident which throws some light upon Mr. Fassett's feeling for his wife is the fact that he allowed the mortgage on their home to be foreclosed after she left, in order to bar her equity. That he did that is manifest from these extracts from his testimony: "Q. As a matter of fact, didn't you have that house sold so that you could get your wife's interest out of it? A. Well, what if I did? She had an equity of $2,800, and I personally ran it up to $3,000, gave her an equity of nearly a thousand dollars. Q. That was your purpose in selling or letting that house go? A. No, sir; not necessarily. The truth of the matter was the mortgagee wanted the property. He owns both sides of it, and wanted that house. He sent people there at times to inquire if I was not willing to sell. Q. The mortgagee didn't get the property, did he? A. He did not. Q. Your father got it? A. Yes, sir; and he was peeved to think that he didn't get it. He expected to get it."

Before passing from those facts, which are either uncontradicted or admitted, reference should be made to a letter from Fassett to his wife, and his testimony in connection with it, since, taken together, they not only aid in the interpretation of the admitted facts, but also point out the significance of the disputed facts in their relation to the admitted facts, and are of value in weighing the testimony tending to prove or contradict such facts. The letter was unsigned, undated, and without an address, and appears to have been written shortly after an interview which Fassett had had with his wife in August, 1921, and was sent to his wife by his oldest son, Warner. In part, it reads as follows:

"I don't know what to write or how to write it, but I must say something. What you told me tonight and all you told me is only the sad truth. I have lied to you, lied about you, deceived you and been unfaithful, and why do I do it? I wasn't brought up that way and don't think I get it from my parents, but where does it come from, and is it ever going to run out? Anna, I have abused you when I had you, and now

that I have lost you, what's left? * * * But what you told me tonight you have told me a hundred times before, but it went right over. Tonight it stuck. Tomorrow with me, Anna, things are going to be different. I am going to start all over and show myself, you and others, that there is a tiny spark of manhood left in me. When I look back over my life what a failure it has been, and what chances I had. Anna, you have been so faithful, so striving and unselfish for our children that now you don't deserve what you are up against. * * * I realize, Anna, that you are lost to me, and now that I have a chance to have others, I don't want them. My ambition now is to have you some day say to me, 'Well, Lawrence, you fooled me; you have really made a man of yourself.' Please destroy this letter and don't tell any one about it, and I will not annoy you with any more. Goodbye."

When he was asked about that letter in the course of his cross-examination, Fassett said that it was only written to get his wife to return to his home; that the statements in reference to her were mere flattery and quite unfounded. His real intentions as to his future conduct, as well as the weight to be given to any statements made by him, are sufficiently shown in the following extract from his cross-examination in reference to the letter: "Q. She had been faithful? A. No, sir. Q. Has she been striving and unselfish for the children? A. No. Q. And did she deserve what she was up against? A. Yes. Q. Then you were lying to her in this letter, as usual? A. I was flattering her—not lying. I was flattering her. * * * Didn't you say, 'I have lied to you, I have lied about you, and I have been unfaithful,' and then you said, 'Tonight I am sincere.' So when you said all of that you were lying, weren't you? A. You can interpret that to suit yourself. I was flattering more than lying. Q. Flattering? A. Yes. Q. And you were telling her what was not true? A. Well, I don't know—the object of the letter was to get her to come back. Q. And you were deceiv-

ing her again? A. Possibly. Q. And you were deceiving her again when you said that you were going to start all over and show yourself and others and her that there was a tiny spark of manhood left in you? A. Well, that may have been the sentiment that I was in at that time. We all get into moods."

The disputed facts, material to the question before us, are these: First, that Fassett, on or about the 11th day of January, 1921, was alone with Mrs. Husband, in a house formerly occupied by Mrs. McDannell, at Bethesda, Maryland, from early in the afternoon until after nightfall; the second is, that Fassett was in an automobile alone with Mrs. Husband on a country road near Glen Echo on Christmas Eve, 1920; while a third fact or group of facts is that Mr. Fassett was, subsequent to October, 1920, frequently in Mrs. Husband's company, danced with her, and took her to the theatre and other places of amusement.

Coming to the first of these questions, the evidence in relation to it can be better understood if we refer briefly to Fassett's connection with the house and his relation to several of the witnesses who testified to his presence there on the occasion referred to.

The house was, in January, 1921, under lease to Mrs. Marcellien McDannell, a sister of the appellant. She had prior to that time moved to the City of Washington, but had left some of her furniture in the house. Fassett had agreed to help Mr. and Mrs. McDannell move their furniture, and he had a key to the house, and he knew it was unoccupied. The house was located at Bethesda, in Montgomery County, his own home was at Brentwood, in Prince George's County, and Mrs. Husband lived in Washington.

Mrs. Lelia M. Kenney lived next door to the McDannell house at Bethesda, and had known Fassett for over two years. She did not know Mrs. Husband. Mrs. Anna E. Crockett lived in the immediate neighborhood of the McDannell house, and she had known Fassett for six or eight

years, and Mrs. Husband ever since she was a child. Both of these witnesses, who were disinterested, testified positively that, on or about the 11th of January, 1921, they saw Fassett go into the McDannell house with a woman in the early afternoon, and that they remained there until dark. Mrs. Kenney testified that Fassett came out of the house in his shirt sleeves and closed the shutters. They both testified that Mrs. Crockett went to the door while they were in the house and knocked, but that no one responded. Mrs. Kenney said that the woman answered the description given of Mrs. Husband, while Mrs. Crockett said that she knew that the woman was Mrs. Husband. Mrs. McDannell also testified that the condition of the bed clothing in the house indicated that it had been used after she left for "immoral purposes," and that Fassett had access to the house. She testified further that she had told Fassett that Mrs. Kenney had seen him in the house with a woman not his wife on several occasions, but that he made no reply to that assertion.

To rebut this evidence Fassett offered his own testimony and that of Mrs. Husband, and he also offered for that purpose the testimony of John Hare. The testimony of Fassett and Mrs. Husband, because of their interest, is not in our opinion strong enough to overcome that of Mrs. Crockett and Mrs. Kenney, considered in connection with the corroboration supplied by the other testimony in the case. Nor does the testimony of Hare add the slightest weight to his case. The testimony of that witness is marked by such a flippant disregard for the obligations imposed by an oath, and for the conventions which control the relations of respectable people, that it cannot be credited. He was offered to prove an alibi, by showing that he had borrowed Fassett's automobile, and the key to the house, and had driven out there on the 10th, 11th or 12th of January, 1921, and that it was he and not Fassett who occupied the house on the occasion referred to by Mrs. Crockett and Mrs. Kenney.

For the reasons stated, his testimony has no intrinsic value, but, as it was offered by Fassett, it does amount to a tacit admission on his part that his, Fassett's, automobile was at the McDannell house at the very time Mrs. Crockett and Mrs. Kenney said he was there with Mrs. Husband.

The next question is whether Fassett was alone with Mrs. Husband in an automobile on a lonely country road shortly before Christmas, 1920. Fassett did not deny that he was on that road in an automobile with Mrs. Husband, but he denied that it was on Christmas Eve. In view of the testimony of Mr. and Mrs. Crockett, both of whom stopped and talked to him while he and Mrs. Husband were in the automobile, he could not deny that he was with her, but as the bill charged that he had committed adultery with Mrs. Husband at the McDannell house on December 24th, 1920, and as there was some vague testimony tending to show that they were there at that time, it became a matter of some importance to show that he was not in that neighborhood at that time. But since the testimony failed to show that he and Mrs. Husband were in the McDannell house on December 24th, 1920, it matters little whether he and she were alone together in the automobile on the 19th of December, as he testified, or whether they were there on the 24th, as Mr. and Mrs. Crockett said, since it is admitted that they were in that situation on one or the other of the two dates. Fassett, with the striking facility for explanation manifested throughout his testimony, said that he had called at Mrs. Weiner's home in reference to some repairs to her cottage, and that Mrs. Husband came while he was there; that when he was about to go he told them he was going into the woods to get some holly for Christmas decorations, and Mrs. Weiner suggested that Mrs. Husband go with him and get some for them. He also said that Mrs. Husband did not leave the car.

As to the remaining facts in dispute, it is sufficient to say that in our opinion it sufficiently appears from the weight

of the evidence that Fassett on numerous occasions, both before and after his wife left his home, was a companion of Mrs. Husband at places of amusement, often danced with her, and frequently visited her mother's home when she was there, and that he frequently drove with her in his automobile.

Before considering the effect of the facts which we have thus stated, we will first state the legal principles by which we must be controlled in such an inquiry as this.

Naturally, there can be no fixed or rigid rule for measuring the force or the effect of the facts established in a case of this character, since the significance of each of a group of facts depends so largely upon its relation to the other facts which accompany it, and conduct, which under certain circumstances may seem innocent and harmless, could under other circumstances justify a more serious and sinister inference.

And while, as we have repeatedly stated, in cases involving a charge of adultery, the complainant must establish the facts upon which the charge rests by clear, convincing, and satisfactory proof, *McCleary* v. *McCleary,* 140 Md. 659; *Kremelberg* v. *Kremelberg,* 52 Md. 553; *Thiess* v. *Thiess,* 124 Md. 292; *Pattison* v. *Pattison,* 132 Md. 362; *German* v. *German,* 137 Md. 424; yet, when those facts are thus established, the court will draw from them all such material and obvious inferences conveyed by them as are consistent with common experience.

As stated by JUDGE BOYD in *Shufeldt* v. *Shufeldt,* 86 Md. 528: "It is not necessary in cases of this character that there be any one act proven which is conclusive of guilt, but the Court must consider the opportunity for the commission of the act, the conduct of the parties, and all circumstances, and then determine from the whole testimony whether it should convince unprejudiced and cautious persons of the guilt of the parties." And in *Loveden* v. *Love-*

*den,* 4 Eng. Ecc. 461, cited in *Kremelberg* v. *Kremelberg, supra,* in somewhat different language the same principles were announced. There it was said "that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion; for it is not to lead a harsh and intemperate judgment, moving upon appearances that are equally capable of two interpretations; neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the careful and cautious consideration of a discreet man. The rational and legal inferences from such facts must be the same." And in *Dicus* v. *Dicus,* 131 Md. 87, JUDGE URNER, speaking for the Court, said: "The proof in this case is clear as to the existence of the disposition and opportunities from which the commission of the adultery charged is to be inferred. It is not necessary, and it is usually impossible, that direct evidence of the fact of adultery shall be offered. The offense may be proven by circumstances which justify the inference of guilt." The principles thus stated, while variously expressed, are generally recognized and accepted. In *R. C. L.,* page 329, it is said: "The courts must perforce take such evidence as the nature of the case permits—circumstantial, direct, or positive—and bring to bear upon it the experiences and observations of life, and thus weighing it with prudence and care give effect to its just preponderance. * * * When, however, adulterous disposition is shown to exist between the parties at the time of the alleged act, then mere opportunity together with comparatively slight circumstances showing guilt may be sufficient to justify the inference that criminal intercourse has actually taken place." In 19 *C. J.,* page 139, it is said: "Proof of an adulterous disposition on the part of the defendant and the alleged paramour, coupled with an opportunity for them to commit the offense, has generally been held sufficient to establish adultery, although there is some authority to the contrary."

See also *Nelson, Divorce and Separation,* secs. 138, 139; *Dunham* v. *Dunham,* 6 Law Reporter, 139; *Allen* v. *Allen,* 101 N. Y. 658.

Considered in the light of these principles, the facts before us compel the conclusion that the appellee committed adultery as charged in the bill, and that a decree should have been passed divorcing the appellant *a vinculo matrimonii* from him.

We have reached that conclusion reluctantly and with a clear apprehension of the unfortunate influence which such a finding may have upon the lives of those against whom it is directed. But, while it is possible that Fassett and Mrs. Husband are guiltless of the offence with which they are charged, no reasonable man of ordinary intelligence and experience could draw that conclusion from the facts in this case. And since these facts are but a chronicle of their acts and conduct, they cannot complain if the Court draws from them the only inference of which they are susceptible, and, if they are injured thereby, they can only blame themselves for having acted in such a manner as to make such an inference necessary.

When a wife leaves her husband because of his supposed relations with another woman who has left her husband because of such real or supposed relations, and when those two, the erring husband and the erring wife, are seen frequently together, when they constantly attend places of amusement together and often dance together, when they openly admit their affection for each other, when they are found together alone on a lonely road far in the country, when he seeks her society in preference to that of his wife, when he spends an afternoon with her alone in an otherwise empty house, with closed shutters, refusing to see or admit callers, when they are on such familiar terms that they address each other by their Christian names, and finally when she goes to live with him in the very home which his wife has left, and when he himself informs his wife that he

has lied to her, lied about her, and had "been unfaithful" to her, there can be but one reasonable or sensible conclusion, and that is that the two persons who had so openly flaunted the proprieties and conventions of ordinary life had not stopped short of adultery.

In our opinion, therefore, the decree appealed from was erroneous and must be reversed, and the cause remanded that a decree may be passed granting to the appellant a divorce *a vinculo matrimonii* from the appellee, and making such provision as to alimony and the care and custody of the children as may be just and proper under the circumstances of this case.

> *Decree reversed and case remanded, that a decree may be passed conforming to the views herein expressed and making such provisions for alimony and the care and custody of the children as the lower court may find just and proper under the circumstances of this case. The costs of this appeal to be paid by the appellee.*