# STEWART *v.* STEWART

[No. 123, September Term, 1969.]

*Decided December 29, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ.

*Harvey B. Steinberg* for appellant.

*William T. Ward,* with whom was *Albert E. Brault* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

This is a divorce action in which Dorothy Stewart, the wife and appellee, was awarded a divorce *a vinculo matrimonii* from the appellant and husband, Clark Stewart, by a decree filed December 16, 1968. Her original bill of complaint prayed for divorce *a mensa et thoro.* That bill was filed on July 13, 1966, after the separation of the parties on July 3, 1966. In the course of the travels of the case through the Circuit Court for Montgomery County permission was granted to Mrs. Stewart to file a supplemental bill of complaint for a divorce *a vinculo matrimonii.*

In addition to divorce, Mrs. Stewart was awarded the custody of two of the minor children of the parties, to-

gether with an award for alimony and counsel fees and a direction that the husband pay the arrearages determined to be due under the prior order of the court for alimony pendente lite and support for the minor children.

The husband here appeals alleging that the chancellor (Moore, J.) erred (1) in granting the divorce on the basis of constructive desertion, (2) that the attorney's fee awarded was excessive, (3) that the sum awarded for alimony for the wife and for the support of the minor children was excessive, and (4) that he was entitled to certain credits relative to the order pendente lite for the support of the minor children. We shall modify slightly the award of counsel fees and affirm the chancellor on the remaining points.

The parties were married on February 8, 1948. Five children were born as a result of the marriage. The oldest son is now 21 years of age. Two of the other sons are now 19 and 16. A third son will be 15 on January 5, 1970. A daughter is 13 years of age. The custody of the daughter and the youngest son was awarded to the mother. The father was awarded the custody of the other three children.

Mrs. Stewart related an incident which took place in the fall of 1965. She and the husband were occupying separate bedrooms. He slept in the basement and she in one of the upstairs bedrooms. He went in her bedroom, turned on a light, and aimed a gun at her. He directed that she follow him downstairs, which she did. They sat on the end of his bed in the basement. He held the gun in his hand as they talked. She said:

> "After awhile I wasn't sure whether he was going to shoot himself or shoot me, but I thought he could easily do either one any moment. Finally, after several hours of talking, he just suddenly told me to go back upstairs—so I left."

Mrs. Stewart related another incident when they had an argument on a Sunday afternoon. Her husband hit

her and knocked her down. He then took her to the basement, tied her up and left her on the bed while he took the children to the swimming pool at the "Y". Upon his return he had sexual intercourse with her and then untied her.

Subsequent to the above incidents which took place around the first of September, 1965, Mr. Stewart moved out, taking an apartment elsewhere. He returned in January of 1966. Mrs. Stewart claimed that the return was not by mutual agreement, but by her husband's announcing that he was moving back.

Stewart does not deny the gun incident. He merely says that he invited his wife rather than ordering her and that he did not aim the gun at her. He claims the gun was unloaded.

When Stewart returned to the home in January of 1966 the parties remained together only about three weeks. An argument developed at the dinner table. Mrs. Stewart threw half of a cup of coffee at him. He gave her 15 minutes to make up her mind—she could get out or he was going to throw her out. Mrs. Stewart got out, taking refuge at the home of her father-in-law. Upon the death of the father-in-law, about three weeks later, she moved back to the home previously occupied by Mr. and Mrs. Stewart. She remained there until the incident which brought about the final separation on July 3, 1966.

On July 3, 1966, Mrs. Stewart permitted the oldest son to go home from church with his aunt to do some work for the aunt. An argument apparently ensued when Mrs. Stewart reached home from church and told her husband the whereabouts of the son. Unfavorable comments were made relative to Mrs. Stewart's family. By his statement, Mrs. Stewart ridiculed him and said he was "just being sick", which he claims to have been a favorite expression of hers alluding to his prior treatment at a mental institution. His version of the incident from there is:

> "She was sitting in the chair and I had heard
> this many times before and she knew it. It got

under my skin and I just somehow or other didn't like standing up and talking down to her. I reached down and put my hand in the neck of her blouse and I used her blouse to lift her up with so that she would be at my level in talking to her. Well, her weight was too much and the blouse ripped and, being extremely frustrated, this was just about all I needed, so I did like this and ripped the rest of it off. At this point I guess I just felt frustrated. I turned away and I didn't do anything more. She got up and she started up the stairs and she said something about my being childish and I didn't say anything and she started on up and stopped halfway up. She said, 'Are you happy now, little boy, does that make you feel better?', and I still didn't do anything and finally she said, 'Well—if it makes you feel any better, I have got a whole closetful of clothes, you can tear them all off.' That did it. I couldn't take it anymore, so I said, 'All right, you put them on and I'll tear them off.' And so I followed her up the stairs and I closed the door for the children were in the house, although I don't recall that they were present at this time. She did put on a blouse and I did tear that one off. About that time Larry came in and I turned around and I told him that he should not concern himself, that his mother was in no danger, that this was something between her and myself and that he shouldn't get involved. Well, he refused to leave. I repeated this at least two or three times. Finally, he jumped on me and started wrestling with me and, to my knowledge, she did not call the police. She refused to. I asked that she do so, but she refused to. I was on the phone talking to the police at the time she and Larry left and I called them both to come back, but they did not do so."

Mrs. Stewart and Larry went to the YMCA where they spent the afternoon and then went to a friend's apartment where they spent the night and some weeks thereafter until other living arrangements could be effected. Mrs. Fox, the friend to whose apartment Mrs. Stewart went, testified to the fact that Mrs. Stewart and her son came to her apartment on July 3. She said they were both upset. There were bruises observed by Mrs. Fox on Mrs. Stewart's arm.

On an occasion subsequent to the separation (New Year's Eve of 1966) Mrs. Stewart said her husband visited the apartment of his wife, accused her of taking two of his records, searched the apartment for the records and then beat her in the stomach with his fists when Mrs. Stewart tried to stop his search. He told her nobody would be able to see the bruises.

Stewart is employed by UNIVAC Division of Sperry-Rand Corporation. His gross salary is $199.60 per week with a "take home" pay of approximately $151.62. He also receives through the Civil Service Commission disability payments from the federal government. He described these as, "Something under $4000.00 — I don't know the exact amount at this time, under $400.00 a month."

The Register of Wills for Montgomery County produced records indicating that Mr. Stewart and his sister are the sole heirs of Mr. Stewart's father. The real estate of the father was appraised at $42,000.00 and the inventory of the personal estate was shown to be $230,-154.60, including securities appraised at $193,575.70 and cash in banks and savings associations of $36,570.31.

Mr. Stewart also receives $35.62 per month by way of rental income, his share of the rent from the home of his father after deduction of a fee for the person collecting. At the time of trial he was receiving $28.00 per month on an annuity taken out by his father, there being an indication that that would run out sometime in 1969.

Mrs. Stewart is employed as a part-time secretary.

Her net earnings are $135.00 each two weeks. She stated that the home in which she was living at the time of trial was owned by her mother. Mrs. Stewart had free use of the house except for the obligation to pay for utilities. The parents paid taxes and mortgage payments. Mrs. Stewart said she had made no computation based on having two children with her. She felt with all of the children that she would require $500.00 to $600.00 per month. Her actual computation of monthly expenses for herself and five children was as follows:

| | |
|---|---:|
| Food | $150.00 |
| Gas and heat for house | 25.00 |
| Electricity | 15.00 |
| Car payments | 58.00 |
| Operation of car | 25.00 |
| Therapy | 160.00 |
| Medical | 25.00 |
| Payment on hi-fi | 10.00 |
| Trash | 24.00 |
| Newspaper | 6.00 |
| Telephone | 10.00 |
| Insurance (sic) | 220.00 |
| Clothing and household incidentals, entertainment and school | 90.00 |
| Repairs | 20.00 |
| Total | $838.00 |

Mrs. Stewart did not testify as to a total for the above expenses.

I

The husband contends that there was no basis for granting a divorce for constructive desertion and that there was insufficient corroboration. He also objects to the chancellor's referral in his opinion to a revival of the prior misconduct, contending that the prior misconduct must itself be grounds for divorce, that the gun incident would not be sufficient grounds and that Mrs. Stewart was not in fear for her life when she continued to live

with her husband for 10 months after the gun incident. Of course, she did not live with him for all of the 10 months after the incident, as the record shows.

Like zoning law, there is no shortage in Maryland of divorce law. A single act of cruelty has been held not sufficient for constructive desertion. *Murphy v. Murphy,* 248 Md. 455, 460, 237 A. 2d 523 (1968). Practice of abnormal sexual relations and demands for their continuance has been held adequate grounds for constructive desertion. *Soles v. Soles,* 248 Md. 723, 727, 238 A. 2d 235 (1968). Nagging, abuse, cursing and swearing do not amount to "cruelty of treatment" or "excessively vicious conduct" which will justify one spouse in deserting the other. *Stevens v. Stevens,* 183 Md. 599, 602, 39 A. 2d 690 (1944).

Unlike *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871 (1969), cited by Mr. Stewart, we here have a case in which the chancellor made a determination, "[u]pon careful consideration [of] * * * the evidence and the demeanor of the witnesses * * *", that the several acts of the husband were such that the wife was obliged to leave, saying that the case fitted into those of this Court in which it has been held that for there to be sufficient ground to leave it must appear that it would be "intolerable for her to remain without loss of her health, without, more or less, apprehension of bodily harm * * *."

In *Pohzehl v. Pohzehl,* 205 Md. 395, 407, 109 A. 2d 58 (1954), Judge Collins said for the Court:

> "Any misconduct of the husband will justify the wife in leaving him when it makes it impossible for her to live with him without loss of her health or self respect. If the conduct of the husband has been such as to render continuance of the marriage relations unbearable, justifying the wife in remaining away from the home, he is the one who is guilty of desertion. *Polley v. Polley,* 128 Md. 60, 97 A. 526; *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259; *Singe-*

*wald v. Singewald,* 165 Md. 136, 166 A. 441; *Kline v. Kline,* 179 Md. 10, 16 A. 2d 924; *Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455; *Hockman v. Hockman,* 184 Md. 473, 41 A. 2d 510; *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915; *Bradshaw v. Bradshaw,* 189 Md. 322, 55 A. 2d 719; *Gold v. Gold,* 191 Md. 533, 539, 62 A. 2d 540; *Scheinin v. Scheinin,* 200 Md. 282, 290, 89 A. 2d 609; *Rosenthal v. Rosenthal,* 202 Md. 375, 381, 96 A. 2d 500." *Id.* at 407.

See also *Liccini v. Liccini,* 255 Md. 462, 258 A. 2d 198 (1969) ; *Beavers v. Beavers,* 255 Md. 450, 258 A. 2d 203 (1969) ; and *Kruse v. Kruse,* 179 Md. 657, 663, 22 A. 2d 475 (1941).

In *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949), the Court said:

"As to condonation by the wife of the husband's former offenses, we are of opinion that his subsequent actions have revived the wife's remedy for those offenses. Condonation is, of course, forgiveness with an implied condition that the marital offenses shall not be repeated and that the party offended shall be treated with conjugal kindness and on breach of this condition, the right to remedy for former injuries revives. *Fisher v. Fisher,* 93 Md. 298, 48 A. 833; *Hilbert v. Hilbert,* 168 Md. 364, 372, 177 A. 914, 98 A. L. R. 1347; *Schriver v. Schriver,* 185 Md. 227, 244, 44 A. 2d 479 * * *." *Id.* at 383.

See also *Dorsey v. Dorsey,* 245 Md. 703, 704, 227 A. 2d 617 (1967).

In a case arising prior to the deletion of Maryland Rule S75, Judge Barnes said for the Court in the case of *Soles v. Soles, supra*:

"In *Comulada v. Comulada,* 234 Md. 287, 293, 199 A. 2d 197, 200 (1964), Judge Horney, for the Court, reviewed the legislative and judicial

history of Maryland Rule S75, and after a careful review of the prior Maryland cases, stated the effect of the rule to be as follows:

'All of the cases hold that the testimony of the plaintiff must be corroborated and that corroboration cannot be dispensed with altogether. [Citing cases]. But in contested cases, where there is no possibility of collusion, it has been consistently held that only slight evidence is required to corroborate the testimony of the complaining spouse. [Citing cases]

'In some cases, such as *Kremelberg v. Kremelberg,* 52 Md. 553 (1879) and *Fassett v. Fassett,* 143 Md. 35, 121 Atl. 859 (1923), decrees of divorce were granted on evidence consisting largely of admissions of adultery. In at least two cases, *Maranto v. Maranto,* 192 Md. 214, 64 A. 2d 144 (1949) and *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949), it was stated, without any qualification as to its trustworthiness, that the corroboration required may be found in evidence of admissions by the other spouse. But in other cases in which it was held that admissions were acceptable as corroborative evidence, it was further pointed out that such evidence, unsupported by other proof, should be received with utmost circumspection and caution. *See Schriver v. Schriver,* 185 Md. 227, 44 A. 2d 479 (1945); *Zulauf v. Zulauf,* 218 Md. 99, 145 A. 2d 414 (1958).' " *Id.* at 728-29.

There is in this case corroboration from the testimony of Mrs. Fox relative to the bruises and Mrs. Stewart's coming to the apartment of Mrs. Fox after she was obliged to leave the Stewart home on July 3, 1966. The events leading up to that departure are well corroborated by Mr. Stewart himself, a portion of whose testimony has been quoted.

We have here testimony that on one occasion the husband routed his wife out of her bed and bedroom in the middle of the night and directed (or "invited", as he preferred to put it) her to proceed to his room where a "conference" was held while the husband pointed the gun at the wife. On another occasion the wife was tied by the husband to a bed in the basement. He left her there while he took the children swimming. On his return the husband proceeded to have sexual intercourse with her without first untying her from the bed. Such testimony, if believed by the chancellor, would be a basis for concluding that continuation of matrimonial cohabitation with safety, health and self-respect was impossible. It was believed. The fact that the wife did not leave immediately does not make the husband's conduct proper conduct. He left. He moved back by announcing that he was moving back and then a short time later gave the wife 15 minutes to make up her mind whether she would get out or he would throw her out. She left, finding refuge in the home of her father-in-law, returning after the death of the father-in-law. With that background, the husband's acts on July 3, 1966, became the straw that broke the camel's back. His conduct clearly revived all that had gone before. There was sufficient corroboration.

## II

Exception is taken to the award of counsel fees in the amount of $1850.00 plus expenses of $56.50, the husband making the point that it took one full day to try the case.

Counsel for the wife submitted an itemization of time spent on behalf of their client by dates and hours, the least time charged being three minutes or .05 of an hour. There were two attorneys involved. The husband objects to being obliged to pay for two attorneys for his wife, contending that he should not be obliged for duplicated efforts. The futher point is made that the wife was not destitute.

As was said for the Court by Judge (now Chief Judge) Hammond in *Newmeyer v. Newmeyer,* 216 Md. 431, 435,

140 A. 2d 892 (1958), "The setting of a fee for the wife's lawyer involves difficulties comparable to those of setting a proper amount of alimony." The criteria for the allowance of counsel fees is as set forth in *Lopez v. Lopez*, 206 Md. 509, 112 A. 2d 466 (1955), where it was said:

> "In determining the amount of the counsel fee to be paid by the husband to the wife's solicitor, the court should take into consideration the financial circumstances of the parties, and determine the amount in accordance with the wife's necessities and the husband's financial ability, and allow an amount that will afford the wife an efficient presentation of her side of the controversy." *Id.* at 520-21.

Competent trial lawyers know that if a case is well-prepared and well-tried it may be likened to an iceberg. A very small portion of an iceberg appears above the surface of the water. Many hours are spent prior to actual court appearance in a case, particularly in a domestic relations case which is bitterly contested, as this one was, stretching over a period of 27 months.

Our consideration of the husband's financial resources and the difficulties and time involved in the preparation and trial of the case compels the conclusion that the award below was larger than it should have been. We believe a fee of $1850.00 for services below and in this Court is as much as should be paid by the husband. Allowance of a fee does not preclude the wife from supplementing that fee. Counsel should be reimbursed for the $56.50 allowed on expenses in the trial court.

### III

In *Newmeyer v. Newmeyer, supra*, the Court said relative to alimony:

> "[I]n reviewing the award of alimony by the chancellor, * * * the factors to be considered

\* \* \* [are] the husband's wealth and earning capacity, the station in life of the parties, their physical condition and ability to work, the length of time they have lived together, the circumstances leading up to the divorce and the fault that destroyed the home \* \* \*." (citing authorities). *Id.* at 434.

Applying those criteria we are not persuaded that the chancellor erred in the amount of his award of alimony to Mrs. Stewart and support for the children in her custody. Although, as Mr. Stewart indicates, the wife's testimony as to expenses may not be a model of precision when she lists expenses of $24.00 per month for trash and $220.00 per month for insurance, his statement to us that "the wife testified to expenses of $500.00 per month for herself and five children" isn't a model of precision either when one carefully examines the testimony. It recalls the comment we made in *Schuman v. Schuman,* 252 Md. 13, 15-16, 248 A. 2d 876 (1969), "that parties estimating their expenses for the purpose of determining what is proper alimony do not always proceed with the same precision with which an accountant would compute a profit and loss statement."

The alimony award is subject to revision if circumstances change.

## IV

This brings us to the last point raised. Mrs. Stewart moved to have her husband held in contempt for not making payments as prescribed by the order passed on August 19, 1966, for alimony and support pendente lite. The chancellor determined the arrearages to be $948.50. He directed that this be paid. The husband contends the chancellor failed to give him credit for the time when the wife could have lived in the former home of the parties and also failed to give him credit for the time that the three oldest children lived with him pending the litigation.

Mrs. Stewart denied that she was ever able to use the

former home of the parties. She said initially her husband appeared to be agreeable and plans were made to move in but at the last minute he decided otherwise. In his testimony he acknowledged that he did not vacate the premises until January of 1967 and that when he left the home he took with him the refrigerator and either the washing machine or a laundry tub. Mrs. Stewart testified that her husband told her to stay away from the former home, a statement he did not deny, despite the contentions here.

The short answer to this first contention (one Mrs. Stewart says was not made below) is that the husband's testimony makes rather clear that he did not make the home available. The record at one point is:

> "THE COURT: The occupancy of the house by your wife and children would have saved you a substantial sum of money, would it not?
>
> "THE WITNESS: It might have saved me some money, but it would have, I am quite sure, created a far more emotional upset than any money that I could have saved would have."

The husband cites *Bradford v. Futrell,* 225 Md. 512, 171 A. 2d 493 (1961), as authority for the fact that he should have received as credit against the pendente lite award the time that some of the children resided with him. Mr. Stewart says that in that case this Court affirmed the trial court's award or credit to the husband in a situation similar to his. The case did not so hold. Bradford there appealed an order determining his arrearages at $12,872.32. The portion of the opinion cited by Mr. Stewart is preceded by the statement of Judge Sybert for the Court:

> "We proceed now to consideration of the question whether a father, subject to a decree requiring periodic payments to his former wife for support of their children, is entitled to allowance for gifts made by him directly to the

children. This question does not appear to have been presented to this Court before, and neither party to this proceeding has cited any reported decision of a Maryland court on the subject, nor have we found any." *Id.* at 517.

Judge Sybert then reviewed the authorities, pointing out that there is one line of decisions to the effect that since the obligation of the father has been fixed by a decree, it cannot be satisfied except by strict compliance with the terms of the decree and that the father may not himself determine the method of payment or to whom payment should be made, his remedy being a motion to modify the decree. Another view is, as Judge Sybert pointed out, that he should be given credit when the expenditures constitute "substantial compliance with the spirit and intent of the decree." Judge Sybert further said for the Court:

"In the absence of some finding of consent by the mother, most courts refuse to allow a husband to dictate how he will meet the requirements for support payments when the mode of payment is fixed by a decree of court. Thus he will not be credited for payments made when he unnecessarily interposed himself as a volunteer and made payments direct to the children of his own accord. [citing authorities] * * * Here, the $2,149.33 disallowed by the chancellor represented remittances to the children themselves, including the automobile and television set, all labeled by the father as gifts, during a period of fifteen years. Their cost would average out at $36.00 per child per year, a rather meager display of paternal generosity. The credits amounting to $3,567.68, allowed by the chancellor, represented payments made to the children but received by Mrs. Futrell and applied to the maintenance of the children, as well as a small amount of clothing. This Court

will not reverse a decision of a court of equity upon a finding of facts unless it is clearly erroneous. Maryland Rule 886 a. We think that the chancellor's findings here were amply supported by the evidence presented." *Id.* at 519.

It will thus be seen that *Bradford v. Futrell, supra,* is not authority for the proposition espoused by Mr. Stewart. The chancellor in his opinion in this case said:

"The husband in his testimony, and especially under interrogation by the Court frankly stated that he felt that he was within his rights unilaterally and without Court approval and without consent of counsel to reduce the amount of payment by fifty percent after the boy, Mark, and the boy, Larry, took up residence at his home.

"It is not for litigants to decide these matters. There are orders that are required to be obeyed, proper orders of the Court, which cannot be amended or modified or abated by the unilateral, voluntary action of one of the litigants.

"We are reluctant, in light of the record here, to cite the defendant husband and father for contempt and will accept his honest and correct answers to the Court as representing his views in the matter, but this is far from saying that he may be permitted to, by his own action, abate the amount of support payments that were ordered by the Court to be paid.

"We will, therefore, although denying the motion to adjudicate him in contempt, will order that the arrearages in the sum of $948.50 be paid by him."

Although a number of petitions and motions were filed on behalf of defendant, no request for modification of the pendente lite order was ever filed with the trial

court. Moreover, the husband testified in response to the question to the Court that he arbitrarily cut the payments in half, that he consulted his attorney about it and the attorney told him there was nothing he could do about it. Apparently, Stewart made one or more changes in attorneys.

Perhaps more important in the matter of *Bradford v. Futrell, supra,* is that which appears as the second contention of Bradford. The Court said:

> "The second contention of Bradford is that the chancellor should have given consideration to the fact that the eldest son, Phillip, left the home of the appellee and resided with the appellant for one month, and then entered the armed services. Appellant cites authority from other jurisdictions to the effect that a father should be credited with sums expended while the children are in his custody for one reason or another. \* \* \* It is plain from the record on all the facts that the court below did not see any justification for modifying the decree in favor of the husband. It in fact ordered that payments of $20.00 per week be continued despite the fact that Phillip had left his mother's home, the court basing this decision on the increased cost of living. There is no need to take judicial notice of the cost of living index to find this allowance for the care of three children a modest one. We find no error in this particular." *Id.* at 520.

We likewise find no error in this case.

> *Decree affirmed, with no counsel fees to be allowed for counsel for appellee in this court; costs to be paid by appellant.*