# HENRY L. CARTER.

## vs.

## FRANCES CARTER.

*Presumption on Appeal—Suit for Divorce—Evidence of Adultery—Acts Subsequent to Original Bill.*

In a suit for divorce, where the lower court had jurisdiction of the subject-matter and of the persons, its action, in the absence of anything in the record to the contrary, will be presumed to be correct.                    p. 266

One seeking to obtain a divorce on the ground of adultery assumes the burden of proving by a fair preponderance of the evidence the facts upon which his right to relief rests.  p. 267

"Preponderance," used in connection with the weight of evidence, refers not only to the number of witnesses who testify to a fact or facts in issue, but also to the character of the witnesses, and to the intrinsic characteristics of the evidence itself, and the probabilities of its truth when tested by the ordinary experience of average people in their daily affairs.  pp. 267, 268

Testimony, in a suit by the husband for divorce on the ground of adultery *held* insufficient to sustain the burden of proof on plaintiff.                    pp. 268-271

In a suit for divorce on the ground of adultery, evidence as to acts occurring after the filing of the original bill, while admissible, under some circumstances, to corroborate testimony as to acts occurring before the filing of the bill, or to remove the effect of condonation, is not in itself sufficient to support a decree for divorce.                    pp. 271, 272

*Decided June 29th, 1921.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

Bill for divorce by Henry L. Carter against Frances Carter. From a decree for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*James Fluegel,* for the appellant.

*Harry S. Wolf, Edwin T. Dickerson* and *Eugene Frederick,* submitting on brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City dismissing the appellant's original and amended bill of complaint, which he filed in that court for the purpose of procuring a divorce from the appellee, his wife, on the ground of adultery.

The record in the case is poorly prepared, for while it displays in unpleasant detail all the testimony, it does not contain either the docket entries or the original pleadings. Hence it does not appear from it when the original bill was filed, nor does it disclose any testimony or other proceedings in reference thereto. The learned court below had jurisdiction of the subject matter and of the persons in the cause, and its action in regard to it will, in the absence of anything in the record to the contrary, be assumed in this Court to be correct. Since, therefore, the record before us only shows that the court dismissed the original bill but fails to show the evidence before it at the time it took that action, we cannot assume that in so doing it committed error, and it becomes unnecessary to notice that part of the decree further.

The testimony before us was taken under the issues made by the amended bill of complaint, and related mainly to matters happening after the filing of the original bill, apparently on the theory that the filing of the amended bill and not the filing of the original bill marked the actual beginning of the suit. The record does not show when the original bill

was filed, but it does show it was filed before April 8th, 1920, since on that day a petition was filed showing that adulteries were committed after the filing of the original bill, and as the only evidence of any adulteries was directed to alleged occurrences happening about eight years before the trial, and in the autumn of 1919 and the winter of 1920, it may be assumed that the original bill was filed earlier than the autumn of 1919.

The amended bill of complaint charged that the defendant "had committed adultery with divers men" whose names were unknown to the complainant. At the conclusion of the testimony offered by the complainant to support this charge, the defendant, as the first witness in her behalf, was sworn. At the conclusion of her examination, before she had called any other witnesses, the court informed the appellant's attorney that, if he so desired, he could offer rebuttal testimony, and replying to an inquiry from him as to whether the appellee had closed her case the court said, "I am closing it for them," and after hearing the rebuttal on the same day it signed the decree from which this appeal is taken.

This action of the court was, in our opinion, justified upon either of two grounds, one, that the only testimony tending to prove adultery related to alleged acts which are said to have occurred after the filing of the original bill and which were not, because of that fact, sufficient to warrant the court in granting the relief prayed; and the other is that the testimony offered was insufficient to meet the burden assumed by the complainant.

It could serve no useful purpose to burden this opinion with any extended analysis of the obscene, indecent and inherently improbable testimony offered by the complainant, nor to comment at length upon the character of the witnesses who testified in support of the appellant's case.

The plaintiff assumed the burden of proving by a fair preponderance of the evidence the facts upon which his right to relief rested. "Preponderance," used in connection with

the weight of evidence, refers to something more than the
number of witnesses who furnish it.   It relates not only to
the number of witnesses who testify to a fact or facts in is-
sue, but also to the character of the witnesses, and to the in-
trinsic characteristics of the evidence itself, and the prob-
abilities of its truth when tested by the ordinary experience
of average people in their daily affairs.   Courts should not
disassociate testimony from the witnesses who give it, because
if the witnesses are unworthy of confidence their testimony
naturally has little value.

These principals are very clearly stated in 5 *Jones, Evi-
dence,* sec. 900, page 405-6, where the author says:   "It is
axiomatic that the credibility of testimony depends not so
much upon the number of witnesses as upon their characters,
their connection with the parties, their means of knowledge
of the specific facts testified to, their manner of testifying,
and other circumstances of which the jury are the proper
judges. * * * The maxim of the law is *ponderantur testes,
non numerantur*—witnesses are not to be counted, but their
testimony is to be weighed.   On this view it is proper to in-
struct the jury that they are not necessarily to be controlled
by the mere numerical preponderance of the witnesses on one
side or the other, but that they should consider such pre-
ponderance only along with all the other facts and circum-
stances conducing to credence, or the reverse, in the testi-
mony of the witnesses on either hand."

The defendant's husband, who was a street-car conductor,
had for some reason, not apparent from the record, left her
before the original bill was fied.   After that she kept board-
ers and furnishing meals in a six-room house on Druid Hill
Avenue in Baltimore.   Among her patrons were Allyn Ra-
gan, who had known the appellant for seven years, Lloyd
Zimmerman, who was at that time also a street-car conduc-
tor, who had known him for a short time, and Eugene Good-
rich, who was also a street-car conductor, and had known the
appellant for about seven years.   These three witnesses and

Nellie Carter, a niece of the appellant, were relied upon to support the charges of adultery made against the appellee.

The testimony of these three men all related to matters occurring in the autumn of 1919 and in 1920, and therefore subsequent to the filing of the original bill of complaint. Ragan, at the time his testimony was taken, was in North Carolina, and his testimony was in the form of a deposition. He went to Mrs. Carter's to board on November 16th, 1919, and stayed there two weeks. The gist of his testimony was that on one occasion Mrs. Carter was sitting on a lounge in the dining room in his presence, and a man named Thornton, who took his meals there, came in, sat down beside her and put his arms around her, and that she put her arms around him and said "this is my man," and that on another occasion he saw her come with the same man from her bedroom, where they had been twenty minutes with the door closed, and that in November he came to the house when it was dark and rang the bell and Mrs. Carter admitted him, and that he found Thornton in the dining room. He also said he left the house because he thought it would be raided.

Zimmerman testified he went to the house in February, 1920, and that he had been taken there by Ragan, that he didn't know Ragan at all, but happened to see him standing on a street corner and asked him for a place to board, and Ragan then took him to Mrs. Carter's. He was boarding then at 1122 North Eutaw Street and had been there but a few days, and subsequently returned there. He said when he first went to appellee's house on February 8th Thornton came in the room where he was and shortly afterwards announced that he was going to change his uniform, and that, when he left, Mrs. Carter announced, in the presence of the witness and several other persons, that he, Thornton, was "her man," the identical remark which Ragan testified she made to him on the 20th of November, 1919. He further said that Thornton returned at 12 o'clock and, when Mrs. Carter showed witness his room, Thornton went with them

and he and Mrs. Carter went in a room and stayed there with the door partly opened for some time. He first said they went into a bedroom, but later, on cross-examination, said he did not know what kind of a room it was. He said that he paid nine dollars a week for his room and board, but that he never took a meal there. This witness, too, said he had on an occasion "come in on" Thornton and the appellee and "saw them hugging." The testimony of these two men that Mrs. Carter had said that Thornton was "her man" was directly contradicted by her, and Jennie Fox, a witness called by the complainant, denied that Mrs. Carter said it on the occasion referred to by Zimmerman. Mrs. Carter also denied any undue intimacy or improper relations with Thornton or any other man, and Jennie Fox, who was constantly in the house, saw nothing improper in the conduct of Mrs. Carter. The stories told by the two men are not convincing and, in view of the opposing testimony and its opportunity to observe the witnesses, we cannot say that the court below failed to give the testimony its proper weight. That a woman, whether she was or not immoral, would on two occasions, months apart, in the presence of witnesses, among whom was a stranger, announce that the supposed paramour was "her man," and would demonstrate her affection for him in the presence of so many witnesses, among whom was a little child, and at a time when she had relatives visiting her, is not to be readily believed. Nor are the two stories free from *indicia* of collusion. That the same woman should on entirely different occasions make the identical remark to two men, and that they should over a year later recall the exact words used and the precise date when they were spoken, is unusual. And again, while Ragan said he himself left the house in November because he feared it would be raided, yet in the following February he took Zimmerman, who already had a boarding place where he had been but a few days, to Mrs. Carter's house to secure board, and although Zimmerman paid for his room and meals, he never took a meal there.

The testimony of Goodrich adds no weight to the complainant's evidence. His credibility is best described in his own language in the following questions and answers: He was asked: "Q. You lied to her" (meaning Mrs. Carter). "A. I did. Q. How many other times did you lie to her? A. I guess I lied plenty of times. Q. About what? You lied plenty about what? A. Different things, I guess."

Nellie Carter, when she testified, was sixteen years old. Her testimony was that, nine and a half years before, she had seen Mrs. Carter and a man called Frank Shannon lying together on a couch in a room at a fishing house at Back River. On cross-examination she said that she never spoke of what she had seen until two or three years before the trial of the case and she admitted that when testifying a year before she had been asked about the same matter, she did not tell about it, because she did not like to tell it then." There was other testimony besides this, but it was either immaterial or inconclusive, and added nothing to the force of that to which we have referred above, and after a careful examination of all the evidence, we are not able to say that the complainant met the burden of proof which he assumed. But the bill should have been dismissed for another reason, and that is, that the only evidence of adultery to be found in the record, other than the appellee's alleged conduct with Shanahan at Back River, related to matters occurring after the filing of the original bill in this case. Under the decisions of this court such testimony, while admissible, under some circumstances, to corroborate testimony as to acts occurring before the filing of the bill, or to remove the effect of a condonation, is not in itself sufficient to support a decree for divorce. This rule and the exception thereto are very carefully and fully stated in the cases of *Schwab* v. *Schwab,* 96 Md. 592, and *Wagner* v. *Wagner,* 130 Md. 349. In the first of these cases the court said: "None of the American courts have, as far as we are aware, followed the precedents of the ecclesiastical courts to the extent of allowing the defendant in divorce suits to

obtain a decree against the plaintiff for a divorce, although a few of our courts have permitted the plaintiff to introduce proof of subsequent acts of adultery under a supplemental bill or an amendment of the original one and obtain relief thereon. * * * The majority, however, of the American courts which have had occasion to pass upon the question apply the principles of equity practice to divorce cases and refuse to permit subsequent acts of adultery by the defendant to be set up by the plaintiff, except as hereinafter stated, and never allow such subsequent acts to form the ground of relief. * * *

"The exception to which we have referred is this. When the defendant has been guilty of subsequent acts of adultery with the same person who is named as *particeps criminis* in the bill, the subsequent acts may be shown as tending to explain or corroborate evidence already taken in reference to the acts originally charged, as was the case in *Thayer* v. *Thayer, supra* (101 Mass. 111). Or where a condonation of the adultery alleged in the bill had been set up in defense of the action, when acts of adultery committed by the defendant *pendente lite* were permitted to be set up by supplemental bill because they operated to revive the original cause of action, as was the case in *Lutz* v. *Lutz, supra* (52 N. J. Eq. 241). But this exception does not go to the extent of permitting a decree for divorce to be founded upon the subsequent acts set up by the supplemental bill," and in *Wagner* v. *Wagner, supra,* it is said: "The court recognized, however, certain important exceptions to the general rule upon which its decision was based." The exceptions were then stated in the language quoted above.

In view of this conclusion the distinction between the scope and effect of a supplemental bill and the effect and scope of an amended bill need not be discussed.

The only other testimony in the case relates to appellee's alleged conduct with Shanahan. The only testimony of this was the recollection of a child six and a half years old given nine and a half years after the occurrence, which was con-

trary to her previous testimony and contradicted by the appellee, and that was manifestly insufficient to establish a charge of adultery.

The record also presents for our consideration eight exceptions relating to the court's action in refusing to allow certain questions asked in the cross-examination of the defendant. We are unable to discover any abuse of the discretion reposed in the court in these rulings. They all relate to collateral matters, the materiality of which is not readily apparent.

For the reasons we have stated, and no error appearing upon the record, the decree appealed from will be affirmed with costs.

*Decree affirmed with costs.*