Swift Tarbell, petitioner-respondent,

*v.*

Virgie Whitcomb Tarbell, defendant-appellant.

[Argued February term, 1938.   Decided May 11th, 1938.]

*Mr. Milton M. Unger,* for the defendant-appellant.

*Mr. William H. Geraghty,* for the petitioner-respondent.

Per Curiam.

The husband's petition for divorce on the ground of adultery was granted and the wife's counter-claim for mainte-

nance was denied. In this there was error. The Tarbells were married November 30th, 1907. They are the parents of three children. The youngest, Swift Tarbell, Jr., was born December 3d, 1919. Mr. Tarbell claims not to have lived with his wife as man and wife since 1919—not since he went to Texas on business. This, of course, she denied. To establish his wife's adultery, a number of letters written to her father's chauffeur were introduced in evidence. These letters carefully examined are, to say the least, most extraordinary epistles for a married woman to write, but it is of much significance in reading these letters to note that she was, during the period when she wrote them, suffering from uremic poisoning and was expecting the birth of a child. The chauffeur occupied the position of more than a menial in her father's household, and she was interested in his advancement. Before the birth of his son, Mr. Tarbell returned to New York and the conduct there displayed towards his wife and children was kindly and affectionate. The bills incident to his wife's subsequent illness entailing a serious operation were met by him, and the proofs indicate a normal family life. When the husband was away because of business exigencies, he wrote affectionately to his wife and children. The couple enjoyed trips together, and family relations continued pleasantly, but somewhat less cordially, from 1924 till 1933, when he left for good. The proofs indicate that if any suspicions of his wife's misconduct were aroused in 1919 they had faded from his mind. The couple and their children occupied the same house.

The reason assigned for the belated charge of adultery is, that the letters were only recently discovered, having been procured from the wife of the chauffeur who had divorced him by reason of his alleged adultery with the daughter of his employer. An unnamed maid in the household first aroused the husband's suspicions in 1918, he testified. When he saw his wife signaling to the chauffeur in 1919, he became so thoroughly convinced of her misconduct that he made up his mind that he would not go back. But the fact is, so far as all outward appearances are concerned, that he did go

back and for fourteen years lived as men usually do with a growing family around them—interested in the children's schooling and progress in sport, as well as in the cultivation and management of the farm where they lived. He could not have lived so contentedly with any real suspicion as to the chastity of his wife if he had the least concern therein. No witness appeared to testify as to any unusual conduct between the wife and the chauffeur. He long ago passed into oblivion with the letters, the result of a sick and temporarily disordered mind. Had there been an affair between the wife and the chauffeur someone must have noticed suspicious conduct. What does a signal mean? It may mean "I am ready to go out in the car." There is no need to speculate. A signal to a chauffeur, in order to arouse suspicions of unchastity in a wife, must be an extraordinary signal, such a one as could be graphically described. Had there been any ground of suspicion in 1919, there is every reason to believe that there would have been other grounds for suspicion in later years. A woman, who would indulge in meretricious relations in 1919 with a chauffeur, would hardly fail to evince during the following years some of the same propensities, especially if it were true that her husband had entirely separated himself from marital relations with her. If it be true that the husband was suspicious of his wife's conduct in 1918 or 1919, he was under a duty to exercise peculiar vigilance and care over her.

"It is laid down that if a husband sees what a reasonable man could not see without alarm * * * he is called upon to exercise peculiar vigilance and care over his wife, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result." *Hedden* v. *Hedden, 21 N. J. Eq. 61, 74.*

Without the letters there is no proof whatever of the offenses alleged. Between September and December, 1919, it seems most unlikely that any occurred. In the early part of the following year, the wife was a very sick woman. In the summer, she and her husband were staying at a camp and apparently enjoying one another's society. The letters

are uncorroborated by any other facts or circumstances. The chauffeur's wife could have been appealed to for letters or evidence years ago. In 1933, when the husband definitely left his family and proceeded to dispose of such property as he had left, the wife started maintenance proceedings in New York. The courts of that state lacked jurisdiction, the matrimonial domicile then being in Connecticut. But it then became apparent to the husband that he must find some way to justify his action. Hence, the search for the letters written sixteen or seventeen years before. If those letters, standing alone, are sufficient to establish adultery, can they be the basis for a valid present divorce? We do not think the letters are sufficient under the facts of this case. Assuming the contrary, a man cannot acquiesce indefinitely in his wife's misconduct and then complain of it. He can hardly be so indifferent as to her conduct that he knows nothing of what she does. Although the record is voluminous, there is not a single other circumstance indicative of wrongdoing save the letters. His conduct in exercising no vigilance over his wife indicates an interest or willingness that she might do as she pleased. If this be so, then he cannot take advantage of what he permitted. *Atha* v. *Atha, 94 N. J. Eq. 692; affirmed, 95 N. J. Eq. 275.*

As we view the letters they were injudicious and indiscreet, which does not mean that they show adultery. *Sargent* v. *Sargent, 92 N. J. Eq. 703.* But for the letters, there is nothing to show anything but exemplary conduct over a long period of years and a somewhat complete and cordial family life until the husband abandoned his family and sold their home.

If the husband knew, or if he should have known of his wife's misconduct, if such there was in 1919, he cannot wait until the years dim the relevant proofs to the contrary to make his charges. In *Barker* v. *Barker, 63 N. J. Eq. 593,* a delay of twenty-five years in pressing charges was held fatal. Hence, had there been misconduct in 1919, the present charge is too late. Because a husband is not diligent in pressing his charges, he must lose the right so to do.

The decree of divorce is reversed, and the wife should be allowed suitable support in an amount to be determined.

*For affirmance*—PARKER, PERSKIE, DEAR, RAFFERTY, WALKER, JJ. 5.

*For reversal*—CASE, BODINE, DONGES, HEHER, HETFIELD, WELLS, WOLFSKEIL, JJ. 7.