## GOLD *v.* GOLD

[No. 23, October Term, 1948.]

534

*Decided December 8, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Jack L. Medwedeff* and *Paul L. Cordish* for the appellant.

*Arthur R. Padgett* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This is a suit for permanent alimony brought in the Circuit Court of Baltimore City by Rose Gold, a resident of Washington, against her husband, Reuben Gold, a resident of Baltimore.

Mrs. Gold alleged in her bill of complaint that she lived with her husband from the time of their marriage in 1907 until October, 1922, when she was compelled to leave him because he abused and ill treated her without cause or reason. She alleged that her husband owns and operates a restaurant and soda fountain at 201 West Saratoga Street, and earns between $200 and $300 per week, while she is destitute. The chancellor ordered defendant to pay her $35 per week as permanent alimony and $100 as counsel fee for her solicitor. Defendant appealed from that decree.

The first question that confronts us on this appeal is whether complainant is barred from relief by laches. She filed the suit in August, 1947, about 25 years after she left her husband. In England, where there was no statute of limitations barring divorce proceedings, the court refused at times to grant a divorce on account of long delay in instituting suit. This policy was ultimately embodied in the English Divorce Act, which went into effect in 1858, and referred the question to the sound legal discretion of the court. Lord Stowell commented on the practice in England as follows: "The first thing which the court looks to when a charge of adultery is preferred is the date of the charge relatively to the date of the criminal fact charged and known by the party; because if the interval be very long between the date and the knowledge of the facts and the exhibition of them to this court, it will be indisposed to relieve a party who appears to have slumbered in sufficient comfort over them; and it will be inclined to infer either an insincerity in the complaint, or an acquiescence in the injury, whether real or supposed, or a condonation of it. It therefore demands a full and satisfactory explanation of the delay, in order to take it out of the reach of such interpretations." *Mortimer v. Mortimer*, 2 Hagg. Consist. 310, 313, 4 Eng. Ec. 543, 545.

In America it has been held in some States that the general statute of limitations is broad enough to include divorce proceedings. In other States the Legislature has enacted statutes specifically providing for limitations in suits for divorce. In New York, prior to the enactment of its divorce limitation statute, the English rule was followed. In a case wherein a husband had filed his bill for divorce after a delay of 23 years, Chancellor Kent said: "The lapse of time will also, and on the soundest principles of justice and policy, form another exception to the right of prosecution for a divorce. An acquiescence of five years without any existing disability was, by the civil law, * * * a bar to a prosecution for adultery. * * * The injured party is presumed to have pardoned or re-

mitted the offense. * * * Long acquiescence will, under
our law, bar a prosecution for any other civil injury;
and why not for this?" *Williamson v. Williamson*, 1
Johns. Ch., N. Y., 488, 492, 493. This doctrine has like-
wise been followed in New Jersey. In *Bartow v. Bartow*,
N. J. Eq., 122 A. 888, the Court said that a petition
for divorce on the ground of desertion filed after a delay
of 25 years could not be maintained in the absence of
satisfactory explanation for the delay. Later, in *Tarbell
v. Tarbell*, 123 N. J. Eq. 581, 199 A. 57, the Court held
that a husband was not entitled to a divorce on the ground
of adultery, which he alleged occurred 17 years before
the petition was filed, because he was not diligent in
pressing his charges. In the circumstances of a particu-
lar case of delay, there may be, and where the delay is
very long there usually is, an inference of what will
constitute a bar, such as insincerity, condonation, a proba-
bility of the existence of some now unknown latent de-
fense, or of proofs too defective or liable to mislead to
be prudently acted upon in behalf of one whose best ex-
cuse is that he has been indifferent to his own rights.
Hence, in the absence of any statute of limitations ap-
plicable to divorce, delay in bringing suit is not alone a
bar, but the court ordinarily requires it to be accounted
for, withholding the relief when the explanation is not
satisfactory. 2 *Bishop, Marriage, Divorce and Separa-
tion*, secs. 413, 639.

Ever since 1842, when the Legislature of Maryland
conferred jurisdiction in all applications for divorce upon
the courts of equity of this State, Laws of 1841, ch. 262,
Code 1939, art. 16, sec. 38, this Court has recognized
the essential difference between a divorce suit and the
ordinary equity case. In divorce proceedings the court
sits, not in the exercise of its ordinary equity jurisdic-
tion, but as a divorce court and is governed by the rules
and principles established in the ecclesiastical courts in
England so far as they are consistent with the provisions
of the Maryland Code. *Dougherty v. Dougherty*, 187 Md.
21, 29, 48 A. 2d 451, 456; *Lickle v. Boone*, 187 Md. 579, 51

A. 2d 162, 170 A. L. R. 156. Divorce proceedings not being strictly equitable proceedings, laches cannot be set up as a defense in such proceedings, unless it amounts to acquiescence in the nature of implied consent, from which the court can consider that it should not invoke its enforcement powers because there has been too much lack of diligence to warrant judicial action.

There is no reason why the English rule applicable to divorce suits entered after long delay should not also apply to suits applying only for alimony. Long before the courts of equity in Maryland were given jurisdiction in divorce proceedings, the Legislature directed the chancellor to hear and determine all causes for alimony is as full and ample manner as such cases could be heard and determined by the laws of England in the ecclesiastical courts there. Laws of 1777, ch. 12; Code 1939, art. 16, sec. 14. So, where a wife delays for many years before entering a suit for alimony, the court will be inclined to treat her delay as a waiver. In other words, the problem is not, strictly speaking, whether there is laches in the ordinary sense of enforcement of equitable rights, but whether the chancellor, in the exercise of his judicial discretion in a case of this nature, should grant relief. 2 *Nelson, Divorce and Annulment,* 2d Ed., sec. 16.28. Laches, even in its ordinary sense, is a relative defense dependent not only upon the passage of time, but also upon reasons that justify the complainant in allowing such time to run without taking action. For example, this Court in *Marshall v. Marshall,* 164 Md. 107, 114, 163 A. 874, held that laches did not bar a wife from enforcement of an alimony agreement incorporated in a decree, where long delay in the enforcement was due to the husband's absence from the State and his financial inability to make the payments. In the instant case complainant was asked why she had waited 25 years before commencing suit, and she replied that as soon as her health improved in Washington she found a job and was employed for 22 years, and during the three years before institution of suit she kept house for her children, now 39 and 36 years

old, and she was able to get along on the money which her husband voluntarily sent her, and there was no need to file a suit for alimony until after the lapse of 25 years.

In this particular case we need not say definitely whether complainant by her delay of 25 years forfeited her right to apply to the court for permanent alimony, because the evidence does not support the allegation of complainant's bill that her husband had so abused and ill treated her that she was forced to leave him. It is well settled that in order to entitle a wife, who does not pray for a divorce, to permanent alimony, the allegations of the bill of complaint must be such as would entitle her to a divorce *a mensa et thoro,* if such relief had been prayed, and these allegations must be supported by a clear preponderance of the evidence. *Roeder v. Roeder,* 170 Md. 579, 185 A. 458; *Zukerberg v. Zukerberg,* 188 Md. 428, 53 A. 2d 20. In the case before us complainant charged her husband, in effect, with constructive desertion. Where a husband's misbehavior has been such as to render continuance of the marriage relation unbearable, or such as is recognized by the law as sufficient to justify the wife in leaving him, he is the spouse who is guilty of desertion. But no misconduct of the husband will justify his wife in deserting him unless it becomes impossible for her to continue to live with him without loss of her health or self-respect, or there is reasonable apprehension of bodily injury or suffering. *Kline v. Kline,* 179 Md. 10, 16 A. 2d 924; *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915; *Bradshaw v. Bradshaw,* 189 Md. 322, 55 A. 2d 719.

The evidence in this case tends to show that Gold was a man of good habits, industrious and kind. He provided amply for his wife and two children, who were 13 and 11 years old in 1922. The parties had been living for some years on North Chester Street. Mrs. Gold had a small dry goods store in the home, while Gold had an upholstery business downtown. Mrs. Gold was not helpless when she decided to leave the State in October, 1922. She took all of the household furniture except her husband's bed, and also took all of the merchandise out of

the dry goods store. Yet, while she has been living ever since in Washington, Gold has voluntarily sent money to her every week to provide for the children. Through the years Gold has gone to Washington almost every Sunday to visit the children, even though his wife refused to speak to him.

Failing to prove cruelty of treatment, Mrs. Gold sought to prove that in 1922 her husband was too intimate with Mrs. Samuel Jontiff, who has been dead for 12 years, and therefore she found life at home unbearable. She complained that Mrs. Jontiff came to their home frequently and made fun of her, and Gold frequently visited the Jontiff home. She placed her greatest reliance on her complaint that when the Gold and Jontiff families were spending a vacation together at Middle River in the fall of 1922 she saw her husband in a compromising position with Mrs. Jontiff when she was on the glider on the front porch of the cottage. It was undisputed, however, that the Golds and the Jontiffs had been intimate for many years, and they jointly rented the cottage at Middle River. Gold swore positively that Mrs. Gold had never accused him of any improprieties with Mrs. Jontiff. On the other hand, Mrs. Gold was evasive and contradictory in her testimony. After she had flatly denied that her husband had accused her in 1922 of intimacy with other men, she later acknowledged that, at her husband's request, she went to the law office of his attorney, Benjamin Baker, to whom her husband had complained about her "running around." She stated at first that she could not recall why she went to see her husband's lawyer, and she could not remember what they discussed. Later, however, she admitted that the attorney asked her about her "running around."

Our evidence statute provides that in suits for divorce, no decree shall be entered upon the testimony of the plaintiff alone, but in all such cases testimony in corroboration of that of the plaintiff shall be necessary. Code 1939, art. 35, sec. 4. The principal object of this statutory provision is to prevent collusion, and when the possibility

of collusion is precluded, the corroboration need be but slight. In proceedings for permanent alimony, the same requirements as to proof, including corroboration, are necessary as where divorce is sought. *Schriver v. Schriver*, 185 Md. 227, 241, 44 A. 2d 479. In the instant case there was no substantial corroboration of the allegation in the bill of complaint. Mrs. Gold testified that she spoke to Jontiff about his wife's relations with Gold, and he did not appear to be disturbed by it. But both of the Jontiffs are dead. This situation illustrates the difficulty of meeting such a charge after the lapse of many years, and the likelihood of doing an injustice by permitting such a charge to stand when those who might be able to refute it are no longer available. Mrs. Gold's chief witness was her daughter, Adelaide, now divorced, who testified that she could recall that in 1922 her father and mother quarreled about Mrs. Jontiff. Her testimony is not convincing. She was only 13 at the time, and it is significant that she could not even recall what school she was attending in 1922. The chief difficulty of complainant, however, is that her own testimony is not convincing.

We come finally to the most dramatic part of Mrs. Gold's testimony, which was intended to bolster her charge that her husband was too familiar with Mrs. Jontiff. She called attention to the fact that on April 11, 1933, Jontiff killed his wife and then killed himself in Gold's apartment. But the inference that Jontiff thought that his wife had been guilty of improprieties with Gold is refuted by letters which Jontiff gave to Gold on the day before the tragedy. In these letters Jontiff, who had been Gold's business associate for many years, entrusted his children to Gold, and directed that if anything should happen to him he wanted his share of their partnership business to go to Gold. Obviously Jontiff would not have written letters of this character if he felt that his wife and Gold had been too intimate. Although delay in bringing suit for divorce or alimony after the discovery of the commission of a marital offense, which is the ground of the suit, does not of itself bar relief, yet it is a circum-

542

stance which is always open to observation and may have an important bearing in influencing the court in deciding against the complainant.

As the evidence in this case failed to sustain the allegations of the bill of complaint, we hold that complainant is not entitled to permanent alimony. The decree of the chancellor must, therefore, be reversed, except as to the allowance of counsel fee for complainant's solicitor.

*Decree reversed in part, and affirmed in part, and case remanded for the passage of a decree to conform with this opinion, with costs to appellee.*