ROSENTHAL *v.* ROSENTHAL

[No. 140, October Term, 1952.]

*Decided May 15, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Allan H. Fisher, Jr.,* with whom was *Bernard E. Stern* on the brief, for the appellant.

No brief and no appearance for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Dorothy L. Rosenthal has appealed here from a decree of the Circuit Court of Baltimore City refusing to grant her a divorce *a mensa et thoro* from her husband, Daniel Herman Rosenthal.

The parties were married in Baltimore in June, 1945. The bride was 18, the groom 31. They have one son, who was born in 1947. Appellant testified that she pleaded with her husband to provide a house or apartment, and although he was making a large salary he refused to do so, and she was forced to live for nearly five years in her mother-in-law's home on South Pulaski Street. She swore that he was cruel to her and she was frightened. In February, 1950, when she was nervous and had a high fever, she went to the home of her mother. As there was very little room in her mother's home, she left there a few weeks later and instituted suit for divorce. The Court granted her temporary alimony.

Several months later appellee and his rabbi urged appellant to return, and she agreed to resume marital relations upon appellee's promise that he would get an apartment. She explained to the Court: "I had a child to consider, and I wanted him to have a father, and I thought if I got an apartment maybe Mr. Rosenthal would appreciate me in a home and his attitude would change * * *." Accordingly in June, 1950, she moved with her child into an apartment which her husband had rented on Bancroft Road. She declared, however,

that he was more abusive after the reconciliation than before. She testified: "Well, my husband tormented me constantly with the thought I made him move. * * * If I did something he did not like he would take up his fist to hit me, and constantly threatened me that he would throw me out and beat me up and disfigure me. It was always a constant threat. I was always very frightened of my husband. He intimidated me."

Appellant recalled specifically an assault which her husband committed upon her one evening in the summer of 1951, when she told him that was going to visit her mother. She testified that he slapped her and threw her down the steps. When she arrived at her mother's home she was hysterical and sick.

Appellant also told of an assault committed upon her one Sunday in the fall of 1951. She said that while she was in the bathroom, her husband dashed in, threw her against the wall, twisted and bruised her left arm, and pulled her diamond ring off her finger. Several hours later, after he had left the house, she notified the Northern Police Station. Appellee flatly denied that he had any altercation whatever with his wife on that day. He asserted that she gave him the ring voluntarily and asked him to sell it for her. He claimed that he sold the ring for $350 and borrowed $800 from his sister, and then made an initial payment of $1,000 on a contract to purchase a house; that the contract was canceled and his deposit of $1,000 was returned to him; and that he returned the $800 to his sister, and gave $250 to his wife as a birthday present with which to buy two coats and to take a trip with her mother to New York. Appellant, branding his story as a fabrication, produced the police officer who came to the apartment to investigate the complaint. The officer testified that when he arrived he found her highly nervous and that she showed him a bruise on her arm. He definitely recalled that she told him she had a "struggle and tussle" with her husband and that he had forcibly pulled her diamond ring from her finger.

Appellant declared that after enduring torture for nearly five years in her mother-in-law's home and for one year and a half in the apartment, she could not endure it any longer. In fact, she said, she had endured it longer than she should have done, as the emotional strain over such a long period of time had injured her health; but she had no money and no place to go, and she had to consider the problem of a home for herself and her child. Finally, in February, 1952, in desperation she called her sister, Mrs. Melvin Kurland, for help. Mrs. Kurland and her husband went immediately to the apartment, found her in a very nervous condition, and offered to let her stay in their home until she could compose herself. Several days later she moved with her child into her sister's home.

The principal object of the statutory requirement that there must be corroboration of the testimony of an applicant for a divorce, Code 1951, art. 35, sec. 4, is to prevent collusion, and in genuinely contested cases the corroboration need be but slight. *Gold v. Gold*, 191 Md. 533, 62 A. 2d 540; *Maranto v. Maranto*, 192 Md. 214, 64 A. 2d 144. In this case there was clearly no collusion. The corroboration of appellant's testimony was abundant.

Dr. Jonas Cohen, appellant's physician, testified that she told him that her husband had treated her harshly. He testified that she told him that his sexual demands upon her were abnormal; that after he quarreled with her, he demanded sexual intercourse. He testified that she told him that her husband raged at her whenever she planned to leave the house to visit relatives or friends. He gave his opinion as an expert that her extreme nervousness was the result of marital conditions, and that her health had been so seriously affected that she could not do justice to any job she might undertake.

Strong corroboration was also given by Kurland. He testified that when he answered appellant's call for help in February, 1952, she looked "like a kid ready to go to the undertaker or a bughouse." After she took refuge in his home, her husband banged on the front door and

shouted: "If you don't let me in, I will kill everybody in there!" Kurland further testified: "He came in my house and struck his wife, and when he was behind the bars I said: 'Dan, you had no business hitting the girl."

The Maryland statute provides that divorces *a mensa et thoro* may be decreed for the following causes: (1) cruelty of treatment, (2) excessively vicious conduct, and (3) abandonment and desertion. Code 1951, art. 16, sec. 34. In this case the wife prayed for a divorce on all three grounds. Her husband's defense was that she had deserted him "without just cause or reason." The chancellor stated that both were temperamental and highstrung and neither was willing to afford to the other that degree of compatibility which each had the right to expect. The chancellor also stated that the scuffles were not acts of cruelty but were merely episodes in which both parties were engaged.

We are convinced that the evidence is sufficient to warrant a divorce either on the ground of cruelty or on the ground of constructive desertion. In the first place, the record is replete with proof that appellant was striving to be a faithful wife and mother. Her earnest desire was to have a home in which she could rear her young son. She declared on the stand: "I tried to be a good wife and mother. I did everything I knew possible. Anything that was in my power I would do. * * * I was always home. I always had my meals prepared, and I always tried to keep my home to the best of my ability."

The difficulty was that her husband had no regard for her feelings or her health. She told the Court: "I have met all kinds of people but I never in my life heard the language that could come out of one man's mouth. When I was eating I would have to go in the bathroom and throw up, and in the presence of my child, and the child was repeating the same thing as my husband. That really made me sick also. . I have never heard the language in my life to come out of any one's mouth that came out of his mouth."

The law is now established in this State that physical violence is not essential to constitute cruelty of treatment. As stated in *Scheinin v. Scheinin*, 200 Md. 282, 289, 89 A. 2d 609, 612: " 'It would be a reproach to the law to permit a husband to ruin the health of his wife or kill her in one way, but not in any other.' " We adhere to the rule that mere rudeness, the use of profane and abusive language, and even sallies of passion do not constitute cruelty as a ground for divorce. *Sullivan v. Sullivan*, 199 Md. 594, 87 A. 2d 604. On the other hand, any misconduct of a husband that endangers his wife's health to a degree rendering it physically or mentally impossible for her to properly discharge the marital duties constitutes cruelty within the meaning of the divorce statute. Moreover, any misconduct of a husband that renders the marital relation intolerable and compels the wife to leave him may justify a divorce on the ground of constructive desertion, even though the conduct may not justify a divorce on the ground of cruelty. Any misconduct of a husband that makes it impossible for his wife to live with him without loss of her health and self-respect, or gives her reasonable apprehension of bodily injury, will justify her in leaving him. *Eberwein v. Eberwein*, 193 Md. 95, 65 A. 2d 792.

Appellant testified that in June, 1950, when she promised to return to her husband, she had serious doubt that he would treat her decently. As she feared, he abused her, threatened her, and humiliated her. For a year and a half she endured the torture. By September, 1951, her nerves were so shattered that her health was being undermined and she needed medical attention. We are persuaded that the abusive treatment which she received from her husband justified her in leaving him. Appellee stated in the Court below that he never used profane language and never struck his wife on any occasion. However, he did not file any brief or defend his case in the Court of Appeals.

For these reasons we must reverse that part of the decree which refuses appellant a divorce *a mensa et thoro,* and remand the case for award of the divorce prayed for.

Appellee testified that for many years he was employed by the Strouse-Baer Company and received a salary of $7,800 per year. The Court ordered him to pay $40 per week as temporary alimony, but in June, 1952, he was discharged by his employer. At the time of the trial he was employed in a tavern with a salary of $50 per week.

Although the chancellor denied the divorce, he awarded the custody of the child to appellant and ordered appellee to pay $15 per week for his support. We direct that appellee be required to pay $12.50 per week as permanent alimony and $12.50 per week for the support of the child, subject to the further order of the Court.

> *Decree reversed in part and affirmed in part, and case remanded for the passage of a decree to conform with this opinion, with costs to appellant.*