## POHZEHL *v.* POHZEHL

[No. 13, October Term, 1954.]

396

*Decided November 12, 1954.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*J. Sumner Wood*, with whom was *James H. Pugh* on the brief, for appellant.

*Joseph B. Simpson, Jr.*, with whom were *Simpson & Simpson* and *Vivian V. Simpson* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree denying the appellant, Joseph F. Pohzehl, a divorce *a vinculo matrimonii* from his wife, Frances June Pohzehl, appellee, on the grounds of adultery, and granting the wife a divorce *a mensa et thoro* from the appellant on her cross bill for desertion. The testimony was taken before an Examiner.

It appears that the appellant, while in the United States Coast Guard, stationed at Norfolk, Virginia, married the appellee in 1943. At that time he knew that she was an illegitimate child. In 1946 they purchased a farm near Rockville, Maryland, about eighteen miles from Washington, D. C., the farm being conveyed to the husband and wife as tenants by the entireties. In addition to working on the farm he was employed as a night guard at the National Health Institute, (Institute), at Bethesda, Maryland. The wife obtained a position as a waitress and hostess at the Statler Hotel in Washington where she was employed for six years. She later obtained a position at the Institute. At the time of the hearing in this case she was there employed as a secretary. Both parties worked on the farm. In July or August of 1951 the wife became pregnant with her first child. She continued to work at the Institute. While employed as a waitress at the Statler Hotel she had met one Lee A. Woods, President of the Pal Bottling Works, who ate there practically every day with other persons from his office. The husband was apparently of a very jealous disposition and in 1949, with Mr. John Griffin

and Mr. James McCauley, he followed her on several occasions. Mr. Griffin testified that the appellant asked him to check up on his wife. Out of friendship for the appellant, at his request, for five or six years he followed the appellee wherever she went. Mr. Griffin further testified that he never saw the appellee conduct herself in any way except as a lady. In April, 1951, while the appellee was still employed at the Statler Hotel, Mr. Griffin and his wife, Mrs. Hilda Griffin, visited the Pohzehl's home and were there about an hour and a half. During that time the appellee brought out a ring and a pocket piece containing a silver dollar and said they had been given her by a regular patron of the hotel, Mr. Woods. He brought them to her from South America. The appellee testified that she paid him $10.00 for the ring.

After this occasion the wife, being pregnant, went to her mother's home in New Hampshire on February 22, 1952, for a long weekend. The wife testified that her husband objected to her going and when she returned he accused her of being with someone else and said that he would ruin that person morally and financially. He mentioned Woods' name. She said as a result of her husband's statement she called Woods and told him that she wished to talk to him and made arrangements to meet him the next day, March 5th, "at the District Line". The appellee testified that she left the Institute at noon and met him at the District of Columbia line. She was driving her Chevrolet automobile. She said she drove to a heavily populated area. The car was parked approximately ten minutes. She told Woods of her husband's threats. After the car had been stopped for approximately ten minutes she heard the trunk lid spring open. She thought the wind had blown it open. She got out of the car to close it and it would not catch. She thought the catch was broken. She went back to get in the car and about that time someone opened the door on the other side where Woods was sitting. He snatched off Woods' glasses, tie pin and wrist watch.

He was half in the car and grabbed Woods around his neck. At first she did not recognize her husband and thought somebody was going to rob the car. She grabbed the intruder's hand and then realized it was her husband. He then came around to her side of the car, snatched the keys out of the ignition and told her it was the last time she would ever drive that car. He swore at Woods and at her. He drove to a police station in the District of Columbia and he and Woods went in. It appeared that the parking had not occurred within the District of Columbia and the appellant then drove them to the Bethesda police station. He told the officers that he had caught Woods and his wife attempting sexual intercourse. After he called his attorney he stated to the captain there that he had been advised not to swear out a warrant. He then told his wife that he did not care how she got home and left in her automobile. The wife arrived home about four o'clock that afternoon. The husband came in about 5:15. She testified that he then said: "Are you ready to go down and sign the farm over to me this afternoon?" He further said that the farm was the only thing he wanted and, if she signed it over to him, that would be the end of the situation. All he wanted was the farm. He further said: "If you don't, I am going to make this a nasty scandal, drag your name through the mud and sue Woods for everything he is worth; break up his home, and it will be hard on the baby." She told him that she would sign on the condition that he would not bring any suit against Woods in any way or call or bother his wife in any way and would not scandalize her. He told his wife that they would sign the deed that afternoon. He called his attorney and received a reply suggesting that they come to his office at two o'clock the next day. The wife stayed alone at the farm that night. He drove his wife to work the next day and took the keys of the car and would not let her drive it, although the title was in her name. Later that day the wife assigned to him the farm and her interest in the cattle, the title to the car, and the

release of any claim for support. The appellant released and relinquished any right of action against Lee A. Woods and agreed not to name him in any action brought against his wife. No money was passed for these transactions. The husband denies that he threatened to sue Woods or made any other threats but admits that he agreed not to sue Woods if the aforesaid papers were signed. The wife stayed at the farm three or four nights after March 5th. On the morning of March 11th the appellant came in the room where appellee was working at the Institute and said he wanted to talk to her for the purpose of a reconciliation. Appellee testified: "He told me he made a terrible mistake and he wanted me to come back to the farm, that he wanted to give me my car back and my interest in the property. * * * He said he would not sue Mr. Woods and he would not make any more accusations against me, and he knew that I had always been faithful to him, and that he was just upset and jealous. He was crying. He said that he had not taken care of the cattle and he had not been home. He asked me if I would go back and help him, feed the stock, etc. I told him that I would." The parties went to the office of appellant's attorney where appellant advised the attorney that he had made a terrible mistake and wanted the farm reconveyed and wanted appellee to be restored to her property. The appellant denies that he made any such statements to his wife, but admits that he went to see her for the purpose of a reconciliation. The attorney for the wife testified that appellant told him that it was a mistake and he wanted his wife back. The deeds were to have been ready the next day. These were drawn by appellant's attorney at the husband's request, but were never executed. They returned to the farm, prepared a meal, fed and watered the cattle. The next day they shucked 36 shocks of corn and worked generally around the farm. They got along well together for three or four days. One evening the telephone rang and appellant answered. The wife testified that she did not know what the call was. The husband then

said to his wife: "That is your boy friend calling; * * *." The husband hung up the telephone, was very angry, and from that time on kept talking about the situation. He asked his wife to tell him a few things and, if she would, he would "fix Mr. Woods good". This is denied by the appellant. His wife replied that she had nothing to tell him about Woods and she would not be a party to such a thing. The husband continued to nag his wife about Woods and finally she became so nervous she told her husband that she needed a rest and she could not have the baby at the farm because he was away at night and used the car, and that she should go home with her mother to have her baby. On March 23rd appellant took his wife to the airport. He gave her a cross as a going away gift. She went to her mother's home in New Hampshire.

Two days later on March 25th a letter was written to Woods by appellant's attorney demanding settlement for alienation of affections. A baby girl, Susan Jane, was born on May 11, 1952. The husband was notified and he went to Concord, New Hampshire, on May 12th. He took his wife a dozen roses, a box of chocolates, and gave her $200.00 for hospital bills. They discussed their marital situation. She told her husband that she had every intention of returning to the farm as soon as she was able. He still said he was going to sue Woods. He told his wife that Woods had cost him all his cattle and a tremendous amount of humiliation. He agreed that if Woods paid about $2,000.00 for the cattle, attorney's fees, what he had wasted on detectives and cabs following her, and the time he lost from part time work, he would bring her back to the farm. The husband admits this. She wanted to return if he would not sue Woods. May 25th was the wedding anniversary of the parties. He called his wife on the telephone and told her that he had bought her an anniversary present but could not send it until his attorneys "had finished with him". On June 4th, he filed an alienation of affections suit against Woods. On June 14th his wife received a locket,

and a cross for Susan. He also sent a card to his wife reading: "Dearest, 9 wonderful years. With all my love, Joe". He also sent a card to the baby. The husband demanded $25,000.00 from Mr. Woods. The demand was later raised to $50,000.00. The suit filed demanded $100,000.00. The wife testified that while this divorce suit was pending she stayed at the home of Mrs. Paul Mills in Montgomery County. Mrs. Mills and the appellee both testified that appellant came to Mrs. Mills' home and asked his wife if they could settle out of court. The wife replied that she would be glad to do this. He asked her what she expected him to return to her. Mrs. Mills testified: "She said: 'My car and half of the farm.' He said: 'You cannot get the car because it is gone'. In a few minutes he said: 'If I give you all of this', and he went over and kneeled down beside her and said 'If I give all this back to you, will you go into a little blackmail with me'. She said 'Not with the lowest dog in the world.' " He also told his wife that he loved her and further said: "Go back to the farm with me and lets really blackmail him." The appellee substantiated Mrs. Mills' testimony. This is denied by the husband. After this occurrence the wife did not feel that she could return to her husband and they have lived separate and apart since May 12, 1952.

Lee A. Woods testified that during the time appellee worked as a waitress in the Statler Hotel he learned her maiden name and the date of her birth and that she came from Concord, New Hampshire. Recalling some of his activities, and after a conversation with appellee's mother, he believed he was appellee's illegitimate father. There is considerable dispute in the case as to whether Woods is appellee's father. It is not necessary that this question be decided here. He explains his association with her on this ground. He denied that he had any improper relations with the appellee.

The appellant testified that on the morning of March 5, 1952, he saw that his wife was dressing in her best clothes. At that time she was seven months "heavy"

pregnant. He immediately went out and concealed himself in the trunk of her car. She drove the car to the Institute to go to work. About noon she left the Institute, went down Wisconsin Avenue into the District to approximately Fessendon Street. She stopped and the door of the car opened. Someone got in and they exchanged "love sentences". The man said: "Let's get out of here, this is a conspicuous spot." They went somewhere on the River Road. The car remained parked from approximately 12:15 to one o'clock. All of this time appellant was in the trunk and he said they engaged in "love talk". He said there was much jarring of the car. He then jumped out and saw what he later characterized as attempted sexual intercourse. He grabbed the man's glasses and watch and swore at him. The appellant admits he was hysterical at that time. They then went to the police station in the District and then to the Bethesda police station. On the advice of his attorney he made no charges. He denies that he cohabited with his wife between March 11th and March 23rd while they were living at their home.

Three witnesses testified that on June 16th and June 30th, 1953, after the suit here was filed, they saw the appellee and Woods in Woods' office, first with, and then without lights at night and again together in appellee's apartment. In explaining these occurrences, the appellee testified that on June 16th, 1953, after both Woods and her mother had testified that he was her father, she was in Woods' office for a short time and they came out of the building after the lights were turned out. The appellee further testified that Woods had not been in her apartment since she moved in, that he came by on two previous occasions to see the apartment and at those times the resident manager and a girl were helping her to clean it. If he had been there on other occasions she had not seen him. She denied any improper relations with Woods.

The appellant in his bill charged his wife with adultery as ground for a divorce *a vinculo matrimonii*. Code,

(1951), Article 16, Section 33. It was said in *Kremelberg v. Kremelberg,* 52 Md. 553, at page 555: "The burden of proof is upon the complainant, and the evidence must establish affirmatively that actual adultery was committed, since nothing less than the carnal act itself can lay the foundation of a divorce for adultery. Direct proof, that is, the evidence of eye-witnesses, is not required, for such is the nature of the offense and the secret and clandestine manner in which it is committed, that proof of this kind is in most cases unattainable; yet where it is sought to be inferred from circumstances, the latter must lead to the conclusion of guilt by fair inference, as a necessary conclusion. *Loveden v. Loveden,* 4 Eng. Ecc. 461. As to what facts shall, and what shall not, constitute proof of adultery, no general rule can be laid down, because the same presumptions do not always follow the same facts, the weight of presumptions depending upon the character, habits and situation of the parties. The only general rule to be laid down on the subject, says Lord Stowell, 'Is that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion; for it is not to lead a harsh and intemperate judgment, moving upon appearances that are equally capable of two interpretations; neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the careful and cautious consideration of a discreet man. The rational and legal inferences from such facts must be the same.' *Loveden v. Loveden,* 4 Eng. Ecc. 462." This rule has been repeated by this Court. *Lang v. Lang,* 155 Md. 464, 470, 471, 142 A. 485, 487; *Bailey v. Bailey,* 186 Md. 76, 87, 46 A. 2d 275, 279. See also *Lickle v. Lickle,* 188 Md. 403, 407, 52 A. 2d 910. The above quotation was quoted in the case of *Lang v. Lang, supra,* where there was testimony of a visit by a paramour to defendant's home, rides together in automobiles, association together in a house without lights after dark, and frequent excursions on cherry and berry picking trips. Adultery is not proved by the mere fact

that a woman accepts marked attention from a man other than her husband in spite of the latter's objection. *Thiess v. Thiess,* 124 Md. 292, 92 A. 922; *Rictor v. Rictor,* 139 Md. 697, 117 A. 925; *Bailey v. Bailey, supra,* 88. As stated by the chancellor here in his opinion, the evidence shows that the wife was indiscreet and that her acts would raise a suspicion of adultery. *Lent v. Lent,* 202 Md. 240, 246, 96 A. 2d 14. Such acts are not sufficient. *Renner v. Renner,* 177 Md. 689, 12 A. 2d 195. The appellant himself, the only eye witness to the occurrence on March 5th on which he relies, characterizes what he saw as attempted sexual intercourse. It is hardly conceivable that adultery could have been committed by a woman who was then seven months pregnant while seated under the steering wheel of an automobile.

The offense on March 5th was therefore not established by direct evidence. To sustain such a charge by circumstantial evidence, a disposition on the part of the defendant and the paramour to commit adultery and an opportunity to commit the offense must be shown. *Burger v. Burger,* 204 Md. 495, 499, 104 A. 2d 923, and cases there cited. Although this woman was followed for five years wherever she went before the suit in this case, the only opportunity shown was on March 5th and there the direct testimony of her husband who was present does not establish the offense. As to the alleged occurrences on June 16 and June 30th, after the suit was filed, these are denied. While such testimony is admissible under some circumstances to corroborate testimony as to acts occurring before the filing of the bill, it is not sufficient to support a decree for divorce. *Carter v. Carter,* 139 Md. 265, 271, 114 A. 902. We are of opinion that the appellant has not met the burden of proof that his wife was guilty of adultery.

As to the cross bill of the wife, the record shows no intention on her part to abandon her husband. In fact the husband admits that his wife wanted to come back from New Hampshire to the farm and he would not let her return unless Woods paid $2,000.00 for the cattle,

attorney's fees, the amount he had spent on detectives following her day after day, and for the time he lost from his work. It is evident that this husband, who had his wife followed for five years previous to the alleged incident of March 5th, was of a very jealous and suspicious nature. Any misconduct of the husband will justify the wife in leaving him when it makes it impossible for her to live with him without loss of her health or self respect. If the conduct of the husband has been such as to render continuance of the marriage relations unbearable, justifying the wife in remaining away from the home, he is the one who is guilty of desertion. *Polley v. Polley,* 128 Md. 60, 97 A. 526; *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259; *Singewald v. Singewald,* 165 Md. 136, 166 A. 441; *Kline v. Kline,* 179 Md. 10, 16 A. 2d 924; *Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455; *Hockman v. Hockman,* 184 Md. 473, 41 A. 2d 510; *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915; *Bradshaw v. Bradshaw,* 189 Md. 322, 55 A. 2d 719; *Gold v. Gold,* 191 Md. 533, 539, 62 A. 2d 540; *Scheinin v. Scheinin,* 200 Md. 282, 290, 89 A. 2d 609; *Rosenthal v. Rosenthal,* 202 Md. 375, 381, 96 A. 2d 500. It is very evident that it would be unbearable for the wife to continue living with this jealous husband, who had had her followed for many years. Although she wanted to continue living with him, he would not permit this unless the alleged paramour paid him money. Certainly no woman could live with her husband with self respect after such a condition. His actions made the marriage relations impossible. As found by the chancellor, the appellant was intensely interested in stripping his wife of her interest in the farm and the automobile and in forcing Woods to pay him money. We are of opinion that the chancellor was correct in granting appellee a divorce *a mensa et thoro* on the grounds of constructive desertion. *Lent v. Lent, supra,* 246.

The appellant also contests that part of the decree which allows his wife $20.00 per week for the maintenance and support of the child, and the allowance to

the solicitors for the wife of a counsel fee of $400.00 for the appeal to this Court. The wife asked for no alimony in her cross bill and received none. The appellant admits that his salary and pension amount to over $2,600.00 per year. An award of $20.00 per week for the support of the child does not seem excessive. *Rosenthal v. Rosenthal, supra,* 382. It is evident that considerable work was done by the solicitors for the wife in the appeal to this Court. The husband has at the least an interest in the farm which is worth from the testimony between $18,000.00 and $22,000.00. We do not deem the fee excessive. *Waters v. Waters,* 191 Md. 436, 441, 62 A. 2d 250. We are informed that a separate suit has been filed contesting the transfers of the property from the wife to the husband. Those transfers are not before us in this case. The decree will be affirmed.

*Decree affirmed, with costs.*